**CONSUMERS UNION OF UNITED STATES, INC., Plaintiff,**

v.

**PERIODICAL CORRESPONDENTS' ASSOCIATION et al., Defendants.**

**Civ. A. No. 1328–73.**

United States District Court,
District of Columbia.

Oct. 11, 1973.

Peter H. Schuck, Carol A. Cowgill, Washington, D. C., for plaintiff; Marvin M. Karpatkin, Ohrenstein & Karpatkin, New York City, of counsel.

Peter R. Reilly, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

This is a declaratory judgment action by Consumers Union of United States, Inc., naming the Periodical Correspondents' Association and the Sergeants-at-Arms of the United States Senate and of the House of Representatives as defendants. The issues are before the Court on cross-motions for summary judgment and have been fully briefed and argued.

Consumers Union, publisher of a monthly magazine known as *Consumer Reports*, has been denied accreditation to the periodical press galleries of the Senate and House and claims that this action, taken in reliance on Rule 2 of the Rules Governing the Periodical Press Galleries, is unconstitutional. There is no disagreement as to the relevant facts.

## I. *Facts*

In order to facilitate press coverage of congressional deliberations, both Houses of Congress have each set aside four separate gallery sections for periodicals, radio and television, newspapers, and press photographers. By rules adopted pursuant to Article I, § 5 of the United States Constitution,[1] the Senate and House have delegated the authority to administer these galleries and promulgate regulations governing them to the Senate Committee on Rules and Administration and to the Speaker of the House, respectively.[2] The Senate Committee and the Speaker have, in turn, adopted regulations for the different press galleries. These are published annually in the *Congressional Directory*, along with the names of the accredited organizations and their approved representatives.[3] They have also authorized the formation of separate correspondents' associations for each type of gallery, composed of newsmen approved for admission to the press galleries, and empowered them to pass upon applications for admission and otherwise to administer the press facilities.[4]

The defendant Periodical Correspondents' Association, for example, adminis-

ters the Periodical Press Galleries of both Houses. As of March 10, 1973, it consisted of 525 members chosen from the 126 accredited publications.[5] The Association has a seven-man Executive Committee, elected by the membership, which is authorized to issue credentials to reporters whose applications are considered in compliance with the Rules Governing Periodical Press Galleries adopted by the Speaker and the Senate Committee on Rules and Administration. Final authority to grant or reject such applications is lodged in the Speaker and the Senate Committee, but it is rarely exercised.

Members of the Periodical Correspondents' Association enjoy a variety of advantages over those reporters who are unable to obtain admission. They are provided with special seating in the Periodical Press Galleries, and therefore do not have to contend for space in the public galleries. Congress furnishes the Association a variety of other facilities, including telephones and typewriters in a room adjacent to the press galleries, and employs four administrators to assist the Association in maintaining these facilities. Members are also permitted entrance to the Senate Presi-

---

1. U.S.Const. art. I, § 5: "Each House may determine the Rules of its Proceedings. . . . "

2. *See* Rule 34, Rules and Manual of the United States Senate 52–53 (1971):

   [The Senate Committee on Rules and Administration] shall make such regulations respecting the reporters' galleries of the Senate, together with the adjoining rooms and facilities, as will confine their occupancy and use to bona fide reporters for daily newspapers and periodicals, to bona fide reporters of news or press associations requiring telegraph service to their membership, and to bona fide reporters for daily news dissemination through radio, wire, wireless, and similar media of transmission. These regulations shall so provide for the use of such space and facilities as fairly to distribute their use to all such media of news dissemination.

   Rule 34, Rules of the House of Representatives, 91st Cong., 2d Sess. 535 (1971):

   Such portion of the gallery over the Speaker's chair as may be necessary to accommodate representatives of the press

   wishing to report debates and proceedings shall be set aside for their use, and reputable reporters and correspondents shall be admitted thereto under such regulations as the Speaker may from time to time prescribe; and the supervision of such gallery, including the designation of its employees, shall be vested in the standing committee of correspondents, subject to the direction and control of the Speaker; . . .

3. The Court takes judicial notice of the Directory. Current listings appear at *Congressional Directory*, 93d Cong., 1st Sess. 843–929 (1973). These rules may also be found in Rule VI, Rules for Regulation of the Senate Wing of the United States Capitol 119–27.

4. *See Congressional Directory*, supra note 3, at 844–45, 886–87, 900–901, 916–917. House Rule 34 appears to have contemplated administration by the correspondents themselves. *See* note 2 *supra*.

5. *Id.* at 918–29.

dents' Room and the House Speaker's Lobby, where they may seek or arrange interviews with Senators and Congressmen. Press tables are provided for members during congressional committee meetings open to the public. Another most significant privilege is involved. Members of the press galleries are granted exclusive permission to attend on-the-record daily press conferences held by the Senate leadership and the Speaker of the House. Membership also greatly facilitates access to press conferences at the White House and administrative agencies.

There are ample periodical press facilities. Many publications have a large number of members entitled to the privileges of the galleries.

*Consumer Reports* is a monthly periodical published by plaintiff with a circulation of nearly two and a quarter million readers. Plaintiff is a non-profit organization which receives virtually its entire revenue from *Consumer Reports,* which sells at newsstands and by subscription but has no advertising. A review of recent publications, of which the Court takes notice, discloses reports on the quality and attributes of named products and articles and comment of interest to consumers. On November 29, 1972, Mr. Gilbert Thelen, Jr. submitted to the Executive Committee of the Periodical Correspondents' Association a written application for membership as a representative of *Consumer Reports.* The application was rejected by the Committee on the ground that *Consumer Reports* is not "owned and operated independently of any industry, business, association, or institution," as required by Rule 2 of the Rules Governing Periodical Press Galleries.[6]

Arguing that the rejection of *Consumer Reports* was arbitrary, plaintiff asked the Executive Committee to reconsider its decision, but Mr. Thelen's application was again rejected on April 16, 1973. On May 18, plaintiff sought review by the Speaker of the House and the Senate

Committee on Rules and Administration. The Senate Committee concurred in the rejection, and the Speaker has made no reply during the four months since plaintiff's request.

Defendants concede that no written guidelines exist for interpreting the indefinite requirement contained in Rule 2. However, during plaintiff's pursuit of its administrative remedies, the basis for its rejection was clarified in a number of significant particulars. Thus, Senator Cannon, Chairman of the Committee on Rules and Administration, was advised by the Association as follows:

"Consumer Reports" does not appear to qualify for admission under Rule II of the Rules Governing the Galleries.

In part, that rule states that no publication can be eligible for admission if it is published by "an association or institution." "Consumer Reports" is published by Consumers Union, a nonprofit organization which is a self-proclaimed advocate of consumer interests and, among other activities, testifies before Congressional committees in behalf of the interests of consumers, as Consumers Union judges those interests.

It is the consensus of the Executive Committee that there is an almost exact parallel between Consumers Union's publication of the magazine "Consumer Reports," and the U. S. Chamber of Commerce's publication, "Nation's Business." If the former were admitted as a journalistic enterprise while its primary purpose was the promotion of consumer interests, the latter then might well qualify to pursue the primary purpose of promoting business interests.

Indeed, it is the opinion of the committee that if any advocacy group's publication is admitted, it might be difficult in all fairness to deny admission to union publications, house organs of corporations, foundation publications, university magazines, etc.

6. *Id.* at 916–17.

It is our understanding that Rule II was promulgated for the express purpose of preventing such advocacy groups from contacting and importuning Senators and Congressmen under the guise of journalists. . . .[7]

This analysis has been summarized by Donald E. Smith, Chairman of the Association's Executive Committee, who characterized plaintiff in the following terms:

The publication Consumer Reports is affiliated with plaintiff which is an "association" under the Rules because it is not primarily a publishing organization but rather is an association organized to work in the interests of consumers. It is this in the nature of plaintiff which distinguishes it from admitted publications and disqualifies Consumer Reports under the Rules. . . .[8]

The record thus fully supports Mr. Smith's statement that

The Executive Committee evaluates an application not only on the content of the publication but on the purpose of its parent association as well. . . .[9]

Under the fuzzy tests apparently applied, such periodicals as the Rippon Society's *Rippon Forum*, the Navy League's *Sea Power*, and the National Welfare Rights Organization's *Welfare Fighter* have been denied admission to the Association, despite the unquestionable interest that these publications have in keeping abreast of congressional activities.

Plaintiff points out that many of the Association's present members would appear to fall within the broad scope of Rule 2, both as written and as interpreted by the Committee. For example, Time, Inc. employs a lobbyist in order to advance its views concerning congressional action on postal rates, and such organizations as *Modern Tire Dealer*, *National Timber Industry*, and the *Military Retirees Journal* undoubtedly represent the views of special interest groups. Other members include *Automotive News*, *Banking Industry Magazine*, *Drug Topics and Drug Trade News*, *Food Processing & Marketing*, *Investment Dealer's Digest*, *Leather & Shoes Magazine*, *Pacific Shipper*, and *Western Stamp Collector*.

It is also significant that, of the four press galleries in each House, only the periodical gallery is closed to "advocacy" groups or media not "owned and operated independently of any . . . institution."[10] Such obviously partisan organizations as the official news agencies of foreign governments are admitted to the radio and television, photographers, and newspaper galleries as a matter of course. Indeed, Consumer News, Inc., is presently accredited to the newspaper correspondents galleries.

Since the controversy as to plaintiff's accreditation continues and the issues are significant, the Court must attempt to resolve the dispute.

## II. *Justiciability*

Before reaching the merits of plaintiff's claim, the Court must determine whether the issues raised are justiciable. A claim is justiciable if "the duty asserted can be judicially identified

---

7. Letter from Donald E. Smith, Chairman of the Executive Committee of the Periodical Correspondents' Association, to Senator Howard W. Cannon, Chairman of the Senate Committee on Rules and Administration, June 6, 1973.

8. Affidavit of Donald E. Smith, p. 4.

9. *Id.*

10. Actual lobbyists are barred from all of the press galleries. However, defendants do not specifically characterize plaintiff or Mr.

Thelen as lobbyists, nor would such a claim be likely to succeed in view of the fact that Congress has expressly exempted from the lobbyist registration statute all periodicals "which in the ordinary course of business . . . [publish] news items, editorials, or other comments . . . which directly or indirectly urge the passage or defeat of legislation. . . ." 2 U.S.C. § 267. Neither plaintiff nor Mr. Thelen has registered as a lobbyist, nor do they lobby.

and its breach judicially determined, and . . . protection for the right asserted can be judicially molded," Baker v. Carr, 369 U.S. 186, 198, 82 S.Ct. 691, 700, 7 L.Ed.2d 663 (1962), and so long as it does not involve a "political question" best left to the other branches of the Federal Government, Powell v. McCormack, 395 U.S. 486, 518, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Although the courts will not normally interfere with the manner in which Congress chooses to regulate its internal procedures, it is well established that a congressional rule which infringes upon the constitutional rights of persons other than Congressmen presents a proper question for the judiciary. Yellin v. United States, 374 U.S. 109, 143–144, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); United States v. Ballin, 144 U.S. 1, 5, 12 S.Ct. 507, 36 L.Ed. 321 (1892).

■■ However, the Court will not reach that question if the action in which it is presented is barred by legislative immunity. Although the defendants did not assert an immunity in their pleadings, the Court raised the issue *sua sponte* in the course of oral argument because of the deference owed by the judiciary to a coordinate branch of government. The Speech and Debate Clause[11] of the United States Constitution protects Congressmen from being called into court to defend actions undertaken as "an integral part of the deliberative and communicative processes by which Members participate in [congressional] proceedings with respect to consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either

House." Gravel v. United States, 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972). *See also* Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). This immunity from suit extends to the agents of Congress, but only to the extent that their conduct would have been protected if performed by the legislators themselves. Gravel v. United States, *supra*, 408 U.S. at 618, 92 S.Ct. 2614.

■■■ The defendant Association and Sergeants-at-Arms are undoubtedly congressional agents acting at the specific behest of Congress and pursuant to its rules. However, their conduct in barring the representatives of certain publications from the periodical press galleries and admitting others neither constitutes an integral part of nor has been shown to have a significant impact upon the proceedings on the floor of either House. Defendants have failed to make a showing that if members of the press whose publications advocate a particular point of view are admitted to the galleries, congressional proceedings will be impeded or disrupted.[12] In the absence of such a showing, it must be concluded that the Speech and Debate Clause does not shield the defendants from a challenge to their admission policies.[13]

It is not for the U. S. Attorney or the Court to speculate about the underlying reasons prompting the exclusion here attempted. The justification, if one exists, must affirmatively appear from the reasons given for legislation and its implementing rules. There is nothing of substance in these materials supporting the action and therefore no basis for assuming, contrary to obvious undisputed facts, that the Houses of Congress were

---

11. U.S.Const. art. I, § 6: "The Senators and Representatives . . . for any Speech or Debate in either House . . . shall not be questioned in any other Place."

12. The available legislative history indicates only that problems occasionally arose many years ago before the establishment of the press galleries when certain reporters were provided seating on the floor itself. *See* Cong.Globe, 32d Cong., 2d Sess. 52 (1852).

13. The only other immunity that might be applicable is the so-called Official Immunity Doctrine discussed in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). However, in suits against congressional agents, official immunity does not extend beyond the scope of the Speech and Debate Clause. Doe v. McMillan, *supra*, 412 U.S. at 323, 93 S.Ct. 2018.

acting to protect the absolute right of Congressmen to speak and debate.

The fact that Association members have access to anterooms adjacent to the floor of each House and closed to the general public could present a special problem. If either House of Congress determined that the informal discussions carried out in those rooms constitute an integral part of the legislative deliberation, the judiciary could not properly entertain a suit against any person enforcing rules limiting access to such rooms. However, that issue is not before the Court. Admission to the Association or to the press galleries need not be dependent upon access to the anterooms, so whatever immunity might attach to activities concerning those rooms cannot extend to other press facilities, privileges or organizations. It is equally clear that rules governing the personal conduct of members while in the galleries or exercising the attendant privileges of such membership, as opposed to rules designed to control what members write or believe, are beyond judicial scrutiny and the Houses of Congress can take appropriate action of this kind.

Accordingly, the claim here presented is justiciable and the Court must turn to the merits.

## III. *The Merits*

Plaintiff's principal contention on the merits is that Rule 2 of the Rules Governing Periodical Press Galleries, on its face and as interpreted by the Executive Committee of the Association and the relevant congressional authorities, violates plaintiff's First Amendment right to freedom of the press and its Fifth Amendment right to due process and the equal protection of the laws.

In applying the facts to these serious constitutional claims it is unnecessary to expatiate at any length upon the role of the press in our society. The press must be free to criticize officials and to discuss public affairs with impunity. Halfway measures will not protect this precious freedom. A free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint. This is a dangerous and self-defeating doctrine.

The Courts have a responsibility to preserve the freedom of the press by barring the imposition of limitations upon the equal access of newsmen to facts of public consequence unless such limitations are clearly justified by a legitimate and demonstrable government interest where freedom of the press or other First Amendment rights are involved. Moreover, the government interest raised in defense of such limitations must be an important or "compelling" one. Police Dept. of the City of Chicago v. Mosely, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). The means selected for furthering that interest must be no more restrictive of individual rights than is reasonably necessary. Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). And the language of the classification may not be so vague or broad that it unnecessarily chills the exercise of those rights or provides insufficient guidance to those who must administer the challenged legislation. Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L. Ed.2d 830 (1973).

Defendants seek to confuse and minimize these issues. They suggest that the First Amendment is not violated because there is no effort to control the content of news, that the galleries are not open to the general public, and that those excluded from the press galleries may gain access to news concerning congressional activities by using the public galleries and other resources available. Upon analysis these contentions are wholly without merit. While it is perfectly true that reporters do not have an unrestricted right to go where they please in search of news, Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L. Ed.2d 179 (1965), the elimination of some reporters from an area which has been voluntarily opened to other report-

ers for the purpose of news gathering presents a wholly different situation. Access to news, if unreasonably or arbitrarily denied by congressional action or publishers meeting under congressional auspices, constitutes a direct limitation upon the content of news, as recognized in Branzburg v. Hayes, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). *See also* Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Washington Post Co. v. Kleindienst, 357 F.Supp. 770, *reaffirmed after remand*, 357 F.Supp. 779 (D.D.C. 1972); McCoy v. Providence Journal Co., 190 F.2d 760 (1st Cir. 1951). Certainly the exclusion of particular reporters from the news presented each morning at on-the-record press conferences, which hundreds of other reporters are eligible to attend, affects the content and quality of the news that is reported as well as access to the sources of news. Moreover, it is important to recognize that this is not a single, sporadic refusal of access. Exclusion from the press galleries constitutes a permanent disadvantage with regard to the gathering of news and has a significant impact when measured in terms of the First Amendment, both upon the publication excluded and others in similar situations. *See* Healy v: James, 408 U.S. 169, 183, 92 S. Ct. 2338, 33 L.Ed.2d 266 (1972).

There should be no glossing over what this record discloses. Under a broad, generalized congressional delegation, authority has been given certain newsmen to prevent other newsmen from having access to news of vital consequence to the public. As a result, a group of established periodical correspondents have undertaken to implement arbitrary and unnecessary regulations with a view to excluding from news sources representatives of publications whose ownership or ideas they consider objectionable. Responsible officials of the House and Senate have not forestalled such discrimination by promulgating clear eligibility requirements, *see* Cox v. Louisiana, 379 U.S. 536, 555–558, 85 S.Ct. 453, 13 L. Ed.2d 471 (1965), nor apparently have

they developed any other means of checking abuse of the Association's delegated authority.

The fact that the galleries for newspapermen and radio and television correspondents have operated with much greater liberality and consequent regard for the demands of the First Amendment serves simply to emphasize the arbitrariness of those managing the periodical galleries. All types of news compete and all types of publications are entitled to an equal freedom to hear and publish the official business of the Congress. Quad-City Community News Service, Inc. v. Jebens, 334 F.Supp. 8 (S.D.Iowa 1971). *Cf.* Kleindienst v. Mandel, 408 U.S. 753, 768–769, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). If members of the Soviet press and press representatives of large, influential, politically active corporations can sit in the other press galleries, there can be no justification for excluding those who advocate the special interests of consumers from the periodical galleries.

The situation disclosed by this undisputed record flouts the First Amendment. It matters not that elements of the press as well as Congress itself appear to have been the instruments for denial of constitutional rights in this instance, for those rights limit the actions of legislative agents and instrumentalities as surely as those of Congress itself. *Cf.* Nixon v. Condon, 286 U.S. 73, 52 S. Ct. 484, 76 L.Ed. 984 (1932).

There must be an end to this self-regulation by indefinite standards and artificial distinctions developed to censor the ownership or ideas of publications. The Constitution requires that congressional press galleries remain available to all members of the working press, regardless of their affiliation. Exclusion of a publication from the galleries can only be sanctioned under carefully drawn definite rules developed by Congress and specifically required to protect its absolute right of speech and debate or other compelling legislative interest. *See* Kovach v. Maddux, 238 F.

Supp. 835 (M.D.Tenn.1965). *Cf.* Healy v. James, *supra*, at 184–194. Such rules must, among other things, be so fashioned that due process is provided prior to exclusion, with opportunity for adequate impartial review wherever a publication is excluded. *See* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 2d 287 (1970).

### IV. *Conclusion*

The exclusion of *Consumer Reports* from accreditation to the periodical galleries of the Senate and House violates the First and Fifth Amendments to the Constitution.