Robert SHERRILL

v.

H. Stuart KNIGHT, Director, United States Secret Service, et al., Appellants.

No. 76–1945.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 23, 1977.

Decided Dec. 15, 1977.

R. Joseph Sher, Atty., Dept. of Justice, Washington, D. C., with whom George W. Calhoun and Benjamin C. Flannagan, IV, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellants.

Mark H. Lynch, Washington, D. C., with whom John H. F. Shattuck, Washington, D. C., was on the brief, for appellee.

Jack C. Landau, Washington, D. C., with whom Christopher B. Fager, Washington, D. C., was on the brief, for amicus curiae.

Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.

Opinion for the Court filed by McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

This case involves a challenge to the system under which applications for White House press passes are acted upon. A journalist denied such a pass by reason of an adverse recommendation of the Secret Service filed a complaint in the District Court. The relief granted was not that a pass be issued to him but, rather, that the Service (1) formulate "narrow and specific" standards by which applications are to be judged and (2) institute certain procedures to be followed in their handling. *Forcade v. Knight,* 416 F.Supp. 1025 (D.D.C.1976). For the reasons hereinafter appearing, we affirm the judgment insofar as it deals with procedures but modify its prescription as to standards.

I

In 1966, plaintiff-appellee Robert Sherrill, who has been the Washington Correspondent for *The Nation* since 1965 and who has throughout this period had credentials for the House and Senate press galleries, applied for and was denied a White House press pass.[1] The denial resulted solely from the determination of the Secret Service, after investigating Mr. Sherrill, that he not be issued the pass. A memorandum from the Secret Service to then White House Press Secretary Moyers requested that the background information obtained about Mr. Sherrill upon which this determination was based "not be disclosed to Mr. Sherrill or his employer."[2]

Although there exist no written procedures pertaining to the issuance of press passes for the White House, it was established in the District Court that these passes are routinely obtained in the following manner. A journalist submits a request for a pass to the White House Press Office. After determining that the applicant has obtained a pass for the House and Senate press galleries,[3] resides in the Washington, D. C. area, and needs to report from the White House on a regular basis[4] (the latter usually being verified by an editor of the publication for which the applicant is a correspondent), the Press Office forwards the application to the Secret Service for a security check, including a background FBI investigation. Whether a pass is then issued depends solely on the recommendation of the Secret Service.[5] There exist no pub-

1. A second party complainant in the District Court was Thomas Forcade, a correspondent for the Alternate Press Syndicate, who was denied a White House press pass in 1971, also at the request of the Secret Service. The judgment of the District Court pertains to both Forcade and Sherrill but, after this appeal was lodged, Mr. Forcade disclaimed further interest in the case, and the appeal as to him was dismissed on April 1, 1977.

2. Add. 6, Brief for Appellee.

3. Membership in the Periodical Press Galleries of the Congress is determined by an association of correspondents, which acts "by virtue of an express delegation of authority as aides or assistants of Congress," *Consumers Union v. Pe-*

*riodical Corr. Ass'n,* 169 U.S.App.D.C. 370, 379, 515 F.2d 1341, 1350 (1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976).

4. Response to Plaintiffs' First Interrogatories (Warren), No. 36. Add. 13, Brief for Appellee.

5. The May 3, 1966, letter from the Secret Service to Press Secretary Moyers states, "Based on the above information [obtained about Mr. Sherrill], Robert Glenn Sherrill will not be issued a White House Press Pass." Add. 7, Brief for Appellee. See also Response to Plaintiffs' First Interrogatories (Kelley), No. 1 ("The Secret Service does not deny a press pass except for security reasons."). Add. 18, Brief for Appellee.

lished or internal regulations stating the criteria upon which a White House press pass security clearance is based.[6]

If the application is denied, the journalist is informed, orally or in writing, that the denial is "for reasons relating to the security of the President and/or the members of his immediate family."[7] When Mr. Sherrill asked why he had been rejected, Secret Service personnel replied that "we can't tell you the reasons."[8] According to affidavits of the Secret Service obtained during discovery below, Mr. Sherrill apparently reapplied for and was denied a press credential in January of 1972, again on the basis of the original Secret Service recommendation.[9]

Also in January 1972, the American Civil Liberties Union, on behalf of Mr. Sherrill, requested Press Secretary Ziegler to state in writing whether Mr. Sherrill had in fact been denied a pass (Sherrill never having received written notice thereof) and, if so, the reasons for this denial. A letter drafted by White House Counsel John Dean and signed on February 11, 1972, by John Warner, Assistant to the Director of the Secret Service, stated that indeed Mr. Sherrill had been denied accreditation "for reasons of security" on May 3, 1966.[10] The ACLU then filed a Freedom of Information Act (5 U.S.C. § 552 (1970)) request for all documents relating to the denial. The Secret Service advised the ACLU that the request-

ed material was exempt from FOIA, and an appeal from the denial of the FOIA request was made on April 11, 1972, to Eugene Rossides, Assistant Secretary of the Treasury Department. In his letter of June 26, 1972, denying the appeal, Mr. Rossides did state:

> For Mr. Sherrill's information, he has been arrested and fined for physical assault in the State of Florida.[11]

Until receipt of Secret Service documents during discovery in the District Court, Mr. Rossides' statement was the first and only indication Mr. Sherrill received of the reason he was considered a security risk. It is clear that the release of this information to Mr. Sherrill was not intended to and did not constitute notice of the reasons for denial of his application with an opportunity to respond thereto. Mr. Rossides' statement was received in the course of a Freedom of Information Act request rather than as part of either a formal or informal administrative appeal of the Secret Service determination. Indeed, appellants have adamantly insisted that there is no right to an administrative appeal of the denial of an application for a White House press pass,[12] and informed this court during oral argument that Mr. Rossides' decision to release information pertaining to the reason for Mr. Sherrill's rejection was contrary to the Secret Service policy not to reveal the basis for denial.[13] Nor did the Rossides letter

---

**6.** Appellants did produce in the course of discovery below a page-long 1972 memorandum from Secret Service Agent Wong to another agent which lists "some of the criteria" for denial of entry to the White House. The District Court found no basis upon which to infer that these criteria were circulated to other members of the Secret Service or to press pass applicants. 416 F.Supp. at 1031.

**7.** Response to Plaintiffs' First Interrogatories (Kelley), No. 27. Add. 22, Brief for Appellee.

**8.** Affidavit of Robert Sherrill, at Add. 37, Brief for Appellee.

**9.** Affidavit of Thomas J. Kelley, June 27, 1974, ¶ 3.

**10.** This was the date of the letter from the Secret Service to Press Secretary Moyers stating that Mr. Sherrill "will not be issued a press

pass." The record does not indicate when or by what means Mr. Sherrill was informed of this decision.

**11.** Add. 5, Brief for Appellee.

**12.** Response to Plaintiffs' First Interrogatories (Kelley), No. 30. Add. 23, Brief for Appellee.

**13.** In the course of discovery below, it was learned that, in addition to the conviction for assault (upon the Press Secretary to the Governor of Florida) referred to in the Rossides letter, the Secret Service decision to deny a pass to Mr. Sherrill was based on a 1962 assault charge in Texas (on which Mr. Sherrill may be subject to prosecution if he ever returns to that state) and on an allegation made by the Press Secretary to the Governor of Florida that Mr. Sherrill was "mentally unbalanced." 416 F.Supp. at 1028–29.

give any indication that appellants were willing to entertain any rebuttal by Mr. Sherrill of the reason given for his press pass denial.

## II

After a subsequent refusal by Mr. Rossides to change his decision, appellee filed this action in District Court, alleging, *inter alia,* that the denial of a press pass under the foregoing circumstances violated the first and fifth amendments to the Constitution. Although appellee requested the District Court to order appellants to grant him a White House press pass, the District Court determined, correctly we believe, that it had no occasion to pass on the merits of the press pass denial. Rather, on cross-motions for summary judgment, the Court remanded the case to the Secret Service, which was instructed to "devise and publicize narrow and specific standards" for press pass denials, and to institute procedures whereby an applicant is given notice of the evidence upon which the Secret Service proposes to base its denial, the journalist is afforded an opportunity to rebut or explain this evidence, and the Secret Service issues a final written decision specifying the reasons for its refusal to grant a press pass. The Service was instructed to reconsider appellee's application under these newly instituted standards and procedures. 416 F.Supp. at 1039–40.

The District Court based its requirement of a written decision upon its determination that denial of a White House press pass to a bona fide journalist violates the first amendment unless it furthers a compelling governmental interest identified by narrowly and specifically drawn standards. The Court felt it would be unable to undertake proper judicial review of the denial of the press pass to Sherrill unless the Secret Service first explained why application of such standards to Sherrill necessitated the denial. With respect to its requirement of notice and opportunity to rebut, the Court relied on its determination that denial of a White House press pass constitutes a deprivation of "liberty" without due process of law within the meaning of the fifth amendment because it interferes with the free exercise of the profession of journalism.

We agree with the District Court that both first and fifth amendment concerns are heavily implicated in this case.[14] We conclude, however, that neither of these concerns requires the articulation of detailed criteria upon which the granting or denial of White House press passes is to be based. We further conclude that notice, opportunity to rebut, and a written decision are required because the denial of a pass potentially infringes upon first amendment guarantees. Such impairment of this interest cannot be permitted to occur in the absence of adequate procedural due process.

---

**14.** We reject at the outset the contention of appellants that this case is nonjusticiable either because protection of the President is vested within the sole discretion of the Executive or because there are no judicially manageable standards for presidential protection. The former argument is wholly without force. Nothing in the Constitution suggests that courts are not to be the final arbiters of the legality of the actions of those protecting the President, *cf. In re Neagle,* 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890). The congressional grants of authority to the Secret Service to protect the President, *see* 18 U.S.C. § 3056 (Supp. IV 1976), and to control access to temporary presidential residences, 3 U.S.C. § 202 (Supp. VI 1976), cannot be said to authorize procedures or actions violative of the Constitution. *Cf. Cafeteria Workers v. McElroy,* 367 U.S. 886, 894, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

Appellant's second argument is precisely that made in *A Quaker Action Group v. Hickel,* 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969). We reassert our conclusion in that case that

we cannot agree with the Government's argument that mere mention of the President's safety must be allowed to trump any First Amendment issue.

. . . [A]bsent a compelling showing . . . that courts cannot evaluate the questions of fact in estimating danger to the President, the final judgment must rest with the courts.

*Id.* at 137 U.S.App.D.C. at 182, 421 F.2d at 1117–18. *See also Frank v. Herter,* 106 U.S.App.D.C. 54, 269 F.2d 245 (Secretary of State's manner of selecting correspondents allowed to travel to China is subject to judicial review), *cert. denied,* 361 U.S. 918, 80 S.Ct. 256, 4 L.Ed.2d 187 (1959).

### III

Appellants argue that because the public has no right of access to the White House,[15] and because the right of access due the press generally is no greater than that due the general public,[16] denial of a White House press pass is violative of the first amendment only if it is based upon the content of the journalist's speech or otherwise discriminates against a class of protected speech. While we agree with appellants that arbitrary or content-based criteria for press pass issuance are prohibited under the first amendment,[17] there exist additional first amendment considerations ignored by appellants' argument.

These considerations can perhaps be best understood by first recognizing what this case does *not* involve. It is not contended that standards relating to the security of the President are the sole basis upon which members of the general public may be refused entry to the White House, or that members of the public must be afforded notice and hearing concerning such refusal. The first amendment's protection of a citizen's right to obtain information concerning "the way the country is being run" does not extend to every conceivable avenue a citizen may wish to employ in pursuing this right.[18] Nor is the discretion of the President to grant interviews or briefings with selected journalists challenged. It would certainly be unreasonable to suggest that because the President allows interviews with some bona fide journalists, he

must give this opportunity to all. Finally, appellee's first amendment claim is not premised upon the assertion that the White House must open its doors to the press, conduct press conferences, or operate press facilities.

Rather, we are presented with a situation where the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom. These press facilities are perceived as being open to all bona fide [19] Washington-based journalists, whereas most of the White House itself, and press facilities in particular, have not been made available to the general public. White House press facilities having been made publicly available as a source of information for newsmen,[20] the protection afforded newsgathering under the first amendment guarantee of freedom of the press, *see Branzburg v. Hayes,* 408 U.S. 665, 681, 707, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Pell v. Procunier,* 417 U.S. 817, 829–35, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), requires that this access not be denied arbitrarily or for less than compelling reasons. *See Southeastern Promotions v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more

---

**15.** *See Zemel v. Rusk,* 381 U.S. 1, 16–17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (dicta).

**16.** *See Pell v. Procunier,* 417 U.S. 817, 833–34, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

**17.** *See, e. g., Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Consumers Union v. Periodical Corr. Ass'n,* 365 F.Supp. 18 (D.D.C.1973), *rev'd as nonjusticiable,* 169 U.S.App.D.C. 370, 515 F.2d 1341 (1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976); *Borreca v. Fasi,* 369 F.Supp. 906 (D.Haw.1974); *Quad-City Community News Service, Inc. v. Jebens,* 334 F.Supp. 8 (S.D.Iowa 1971). *Cf. Lewis v. Baxley,* 368 F.Supp. 768 (M.D.Ala.1973) (striking down financial disclosure requirement for newsmen).

**18.** *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

**19.** Appellants have stated that the applicant is required to have a pass to the House and Senate galleries because this verifies the "professional credentials" of the applicant. Response to Plaintiffs' First Interrogatories (Warren). Add. 16, Brief for Appellee. Appellee has not challenged this assertion.

**20.** As of March 5, 1975, there were apparently 1,589 outstanding White House press passes. Response to Plaintiffs' Supplemental Interrogatories (Wong), No. 2. Add. 29, Brief for Appellee.

arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491–92, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting); *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943) ("right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection") (L. Hand, J.).

 Given these important first amendment rights implicated by refusal to grant White House press passes to bona fide Washington journalists, such refusal must be based on a compelling governmental interest. Clearly, protection of the President is a compelling, "even an overwhelming," interest, *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), and we have no basis for rejecting the explicit finding of the District Court that the record in this case demonstrates that denial of a press pass to appellee proceeded solely from concern for "the physical security of the President." 416 F.Supp. at 1036 n.10. However, this standard for denial of a press pass has never been formally articulated or published. Merely informing individual rejected applicants that rejection was for "reasons of security" does not inform the public or other potential applicants of the basis for exclusion of journalists from White House press facilities. Moreover, we think that the phrase "reasons of security" is unnecessarily vague and subject to ambiguous interpretation.

 Therefore, we are of the opinion that appellants must publish or otherwise make publicly known the actual standard employed in determining whether an otherwise eligible journalist will obtain a White House press pass. We do agree with appellants that the governmental interest here does not lend itself to detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account in applying this standard. It is enough that the Secret Service be guided solely by the principle of whether the applicant presents a potential source of physical danger to the President and/or his immediate family [21] so serious as to justify his exclusion. *See A Quaker Action Group v. Morton,* 170 U.S.App.D.C. 124, 516 F.2d 717 (1975). This standard is sufficiently circumspect so as to allow the Secret Service, exercising expert judgment which frequently must be subjective in nature, considerable leeway in denying press passes for security reasons. At the same time, the standard does specify in a meaningful way the basis upon which persons will be deemed security risks, and therefore will allow meaningful judicial review of decisions to deny press passes. We anticipate that reviewing courts will be appropriately deferential to the Secret Service's determination of what justifies the inference that an individual constitutes a potential risk to the physical security of the President or his family.

### IV

 In our view, the procedural requirements of notice of the factual bases for denial, an opportunity for the applicant to respond to these, and a final written statement of the reasons for denial are compelled by the foregoing determination that the interest of a bona fide Washington correspondent in obtaining a White House press pass is protected by the first amendment. This first amendment interest undoubtedly qualifies as liberty which may not be denied without due process of law

---

**21.** The current policy of the Secret Service is to deny a credential "for reasons relating to the security of the President and/or the members of his immediate family," Response to Plaintiffs' First Interrogatories (Kelley), No. 27. Add. 22, Brief for Appellee. 18 U.S.C. § 3056 (Supp. VI 1976) authorizes the Secret Service to protect, *inter alia,* "the person of the President . . . , the members of his immediate family, the President-elect, the Vice President . . . , and the Vice President-elect." We see no reason to alter Secret Service policy as to whose protection is considered in denying White House press passes.

under the fifth amendment.[22] The only further determination which this court must make is "what process is due," *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).[23] We think that notice to the unsuccessful applicant of the factual bases for denial with an opportunity to rebut is a minimum prerequisite for ensuring that the denial is indeed in furtherance of Presidential protection, rather than based on arbitrary or less than compelling reasons. *See Greene v. McElroy,* 360 U.S. 474, 496–97, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914). The requirement of a final statement of denial and the reasons therefor is necessary in order to assure that the agency has neither taken addition-al, undisclosed information into account, nor responded irrationally to matters put forward by way of rebuttal or explanation. This requirement also will avoid situations such as occurred in the case before us, where an applicant does not receive official written notification of his status until more than five years after the status decision is made.[24]

Having determined that appellants' failure to articulate and publish an explicit and meaningful standard governing denial of White House press passes for security reasons, and to afford procedural protections to those denied passes, violates the first and fifth amendments, we affirm that portion of the District Court's judgment requiring notice, opportunity to be heard, and a final written statement of the bases of denial. We remand that portion of the District

**22.** A related and perhaps equally compelling *property* interest may also be said to require the procedural protections of the fifth amendment. It is apparent that all parties to this case recognize the right of a journalist to a White House press pass if he has obtained House and Senate press credentials, resides in Washington, and has a need to report from the White House, *unless* he is a source of potential danger to the President or his family. There is no indication in the record that the Secret Service has ever denied press credentials for any other reason. Nor is the Secret Service authorized to deny credentials for non-security-related reasons. It could be argued, convincingly we believe, that in these circumstances, appellee has a justifiable expectation that the only basis for the government's refusal to grant a White House press pass is concern for the physical security of the President or his family. While appellee's entitlement is not created expressly by the Constitution or by positive federal law, it is created by the consistent, positive action of government officials. Compare *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (opinion of Rehnquist, J.); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Not every such entitlement is subject to procedural protection, of course. *See Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). But when the substance of the property interest involves first amendment values to the degree of this entitlement to a White House press pass, it would be difficult not to infer constitutional recognition of this interest.

Were such an inference made, the standard we have required to be articulated would operate to define explicitly the limits of the entitlement, and the procedures we require would ensure that those due the entitlement are not deprived of it. However, because appellee's first amendment liberty interest independently requires the standards and procedural protections set forth in this opinion, we do not reach the question of whether appellee also has a property entitlement of constitutional magnitude.

**23.** We have no occasion to. consider what procedures must be employed in the revocation, for security reasons, of an already-issued White House press pass.

**24.** We recognize that this appeal involves only one newsman and that appellee has not shown, either in the proceeding below or before this court, that there have been numerous other instances of press pass denial without articulation of adequate standards or employment of adequate procedures. But it has been conceded that the actions taken with respect to appellee are the result of well established policies of appellants which are applicable to all press pass denials. *See* pp. ———— of 186 U.S. App.D.C., pp. 127–128 of 569 F.2d *supra.* Thus, we see no equitable impediment to our disposition of this appeal, which in effect requires changes in appellants' policies and procedures with respect to all press pass denials. Compare *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (low number of constitutional violations not sufficient to establish supervisory liability for unconstitutional policies).

Court's judgment requiring appellants to develop "narrow and specific standards" for press pass denials in order that this requirement may be modified in accordance with this opinion.

*It is so ordered.*