UNITED TEACHERS OF DADE, a labor organization, and Annette Katz, Plaintiffs,

v.

Merrett R. STIERHEIM, in his official capacity as Superintendent of Miami–

Dade County Public Schools, and the
School Board of Miami–Dade County,
Defendants.

No. 02–21932–CIV.

United States District Court,
S.D. Florida.

July 10, 2002.

Robert Rivas, Rivas Law Firm, Tallahassee, FL, for United Teachers of Dade and Annette Katz.

Hector James Montalvo, Coral Gables, FL, for Merrett R. Stierheim (as Superintendent of Miami–Dade County Public Schools) and School Board of Miami Dade.

## ORDER GRANTING PRELIMINARY INJUNCTION

UNGARO–BENAGES, District Judge.

THIS CAUSE came before the Court for expedited consideration of the Plaintiffs' Motion For Preliminary Injunction, filed July 3, 2002.

THE COURT has considered the Motion, the testimony presented by both sides at the Preliminary Injunction Hearing held before the undersigned on July 9, 2002, and the pertinent portions of the record, and is otherwise fully advised in the premises.

### FACTUAL BACKGROUND

The Plaintiffs, United Teachers of Dade ("UTD") and Annette Katz, filed this action on July 1, 2002 against the Defendants, Merrett R. Stierheim and the School Board of Miami–Dade County, Florida, seeking a declaratory judgment, temporary and permanent injunctive relief, and damages pursuant to 42 U.S.C. § 1983. This Court thus has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

UTD, a teachers union, is publisher of *UTD Today*, a monthly newspaper. Plaintiff Katz serves as editor and a reporter for *UTD Today*. *See* Sworn Declaration

of Annette Katz ("Katz Declaration") ¶ 2. Defendant Stierheim is Superintendent of Miami–Dade County Public Schools. Sued in his official capacity, he has full authority from the School Board to enact the express policy at issue here.

The School Board provides a press room to facilitate the news media's coverage of its meetings. The press room includes desks, chairs, electrical outlets and phones. While in the press room, news reporters can hear and see the School Board meeting from behind large windows, can speak to their editors and others by telephone, and can use laptop computers without disturbing the people in attendance at the meeting. *Id.* ¶ 5.

As editor and reporter for *UTD Today,* for more than two decades Katz has routinely made use of the School Board press room to cover meetings of the School Board of Miami–Dade County. *Id.* ¶ 6. *UTD Today* intensively covers the School Board's activities and is circulated to 19,-000 subscribers. It is circulated not only to UTD members, but also, without discrimination, to anyone who pays the $5.00 yearly subscription fee. *Id.* ¶¶ 3, 4.

On May 14, 2002, Stierheim promulgated an administrative regulation named Press Room Procedures ("policy" or "regulation") to govern the use of the School Board press room. *See* Composite Exhibit A to both the Complaint and the Katz Declaration. Pursuant to the regulation, the use of the press room was limited to "working media representatives" defined by the Office of Public Relations "as individuals employed by a newspaper or broadcast organization intended for general circulation." *See id.* The policy specifically excludes "a newspaper intended primarily for members of a particular profession or occupation" and "anyone employed by the various labor unions in any capacity including those who work for union publications." Complaint Exhibit A.

Accordingly, only those media personnel who work for the "general-circulation media" are to be considered "accredited news gatherers" for purposes of using the press room. Mayco Villafaña Affidavit ¶ 7. Additionally, the Press Room Procedures "allow a general circulation media representative to call any individual into the press room for a quick interview or to quickly clarify a newsworthy issue." *Id.* ¶ 8.

The purported interest behind the policy was to address the perceived problem of non-media representatives (1) arriving early to the press room and taking the front seats with desk spaces in which media members were to use their laptops; (2) using the press room as a staging area for organizing protests; (3) taking up the remaining seats reserved for the press; (4) lobbying their own point of view on a variety of issues; and (5) verbally attacking media members. *See id.* ¶ 5. According to Villafaña, the Office of Public Relations, through Stierheim, enacted Press Room Procedures "because of the overcrowding and disruption concerns and the fact that reporters want a press room unfettered from any undue influence." *Id.* ¶ 6. Defendants rely on two letters sent to Villafaña from journalists at WPLG/TV 10 and the Miami Herald complaining that UTD officials, including Katz, engaged in the above activities. *See* Defendants' Response Exhibit B.

Pursuant to the Press Room Procedures policy, Katz has been prohibited from using the "general-circulation media" press room to cover the regular monthly School Board meetings in May and June and two special meetings during the same period. Katz Declaration ¶ 8. She is the only reporter affected by the new School Board policy. *Id.* ¶ 14. The School Board intends to enforce its policy against Katz and *UTD Today* at a meeting on July 10 and subsequent meetings. *Id.* ¶¶ 9–11.

The UTD and Katz seek a preliminary injunction to prohibit Stierheim and the School Board from barring Katz from using the press room, effective in time to enable her to use the press room on July 10, 2002. They claim the School Board's new policy violates their First and Fourteenth Amendment rights.

### LEGAL ANALYSIS

██ In order to satisfy the requirements for a preliminary injunction, the plaintiffs "must establish: (1) a substantial likelihood of succeeding on the merits; (2) a substantial threat of irreparable injury if relief is denied; (3) an injury that outweighs the opponent's potential injury if relief is granted; and (4) an injunction would not harm the public interest." *Gold Coast Publications, Inc. v. Corrigan,* 42 F.3d 1336, 1343 (11th Cir.1994).

As to the first element, Plaintiffs argue the School Board's Press Room Procedure policy ("policy") was promulgated to discriminate against UTD in retaliation for UTD's opposition to the School Board and its administration on policy issues. *See* Motion at 7. Plaintiffs contend the School Board's policy explicitly discriminates against Katz and *UTD Today* because it is a "union publication" and because it is "intended primarily for members of a particular profession or occupation." Complaint Exhibit A. Plaintiffs maintain there is a substantial likelihood they will succeed on the merits of their First Amendment claim because the law is well established that the government may not discriminate against a newspaper on the basis of the paper's viewpoint. *See Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 828–829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (stating "[d]iscrimination against speech because of its message is presumed to be unconstitutional ... When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.... Viewpoint discrimination is thus an egregious form of content discrimination.").

██ The Defendants justify their policy and denial of Plaintiffs' access to the press room on the ground that *UTD Today* is not a member of the "working media" defined as "individuals employed by a newspaper or broadcast organization intended primarily for general circulation, as opposed to those individuals employed by a newspaper intended for members of a particular profession or occupation." Villafaña Affidavit ¶ 9. According to Defendants' policy, only those media personnel who work for the "general-circulation media" are to be considered "accredited newsgatherers" for the purposes of using the press room. Defendants maintain they can define the "general-circulation media" to exclude representatives of union publications and therefore can prohibit representatives of *UTD Today* and Katz from the press room.

Defendants' argument is not supported by the law. In *Consumers Union of United States, Inc. v. Periodical Correspondents' Assoc.,* 365 F.Supp. 18, 22–23 (D.D.C.1973), *rev'd on other grounds,* 515 F.2d 1341 (D.C.Cir.1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976), the court held it was unconstitutional for Congress, after deciding to provide press room facilities to magazines, to discriminate against *Consumer Reports* on grounds that it was "owned and operated" by a "self-proclaimed advocate of consumer interests." The court further stated:

A free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint. This is a dangerous and self-defeating doctrine.

*Consumers Union,* 365 F.Supp. at 25.[1] In accordance with this law, Defendants may not discriminate against Plaintiffs because of *UTD Today's* viewpoint or because the publication's primary constituency consists of members of a teacher's union. *See Sherrill v. Knight,* 569 F.2d 124, 129 (D.C.Cir.1977) (noting "arbitrary or content-based criteria for press pass issuance are prohibited under the [F]irst [A]mendment"); *Quad–City Cmty. News Serv. v. Jebens,* 334 F.Supp. 8, 17 (S.D.Iowa 1971) (stating "any classification which serves to penalize or restrain the exercise of a First Amendment right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional"). As in *Consumer Reports,* Defendants' definition of "general-circulation media," "working media," and "accredited news gatherers" attempts to limit "the access of certain reporters to facts relating to the public's business … merely because they advocate a particular viewpoint" in their publication. *Consumers Union,* 365 F.Supp. at 25.

Additionally, Defendants purport to rely on the scope of a publication's circulation to make their classification. It follows that a publication's circulation results from its subscriber's interest in the content of the newspaper. Thus, in order to classify *UTD Today* as a "particular-profession" publication Defendants necessarily are considering "content-based criteria" in

drawing their conclusion. *See Sherrill,* 569 F.2d at 129. Moreover, to the extent *UTD Today* is available to anyone who pays the $5.00 yearly subscription fee, it may be considered a "general-circulation" publication. Consequently, at this stage of the proceedings, the Court finds that Plaintiffs have produced sufficient evidence to show a substantial likelihood of success on the merits of their First Amendment claim.

Defendants further contend that Plaintiffs have not demonstrated a substantial likelihood of success on the merits because their policy does not violate the First Amendment and it meets the rational basis test as it was enacted to serve a legitimate government interest. As to the First Amendment claim, Defendants argue Plaintiffs have not alleged that they have been denied entrance to the auditorium where the School Board meetings are held or that they have been denied access to any information, general press conferences, documents presented at the meetings or sources of information. Response at 5.

■ The exclusion of Plaintiffs from the press room reserved for members of the "general-circulation media" constitutes denial of access to information even if the Plaintiffs are allowed entry into the auditorium or given access to another media room.[2] The court in *Consumers Union* stated:

---

1. Although *Consumers Union* was vacated based on the political question doctrine, *Consumers Union,* 515 F.2d at 1347, the trial court's holding on the merits in *Consumers Union* has been repeatedly approved and applied where the political question doctrine was not a bar. *See, e.g., Borreca v. Fasi,* 369 F.Supp. 906, 909 (D.Haw.1974); *Lewis v. Baxley,* 368 F.Supp. 768, 776–777 (M.D.Ala. 1973). Even the U.S. Circuit Court for the District of Columbia, the court that vacated *Consumers Union* as a non-justiciable political question, subsequently endorsed its holding

on the merits. *Sherrill v. Knight,* 569 F.2d 124, 129 n. 17 (D.C.Cir.1977).

2. Defendants' attempt to create a "separate but equal" media room for "particular-profession media" does not comport with the case law requiring all news reporters be given equal access to places reserved for the media. *See Consumers Union,* 365 F.Supp. at 25–26; *ABC, Inc. v. Cuomo,* 570 F.2d 1080, 1083 (2d Cir.1977); *Westinghouse Broad. Co., Inc. v. Dukakis,* 409 F.Supp. 895, 896–97 (D.Mass. 1976); *Lewis v. Baxley,* 368 F.Supp. 768, 776–

While it is perfectly true that reporters do not have an unrestricted right to go where they please in search of news, . . . the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation. Access to news, if unreasonably or arbitrarily denied . . ., constitutes a direct limitation upon the content of news.

*Consumers Union,* 365 F.Supp. at 25–26 (citations omitted). *See also ABC, Inc. v. Cuomo,* 570 F.2d 1080, 1083 (2d Cir.1977) (granting a federal injunction to restrain state court prosecution for "trespassing" because "once there is . . . participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable"); *Westinghouse Broad. Co. Inc. v. Dukakis,* 409 F.Supp. 895, 896 (D.Mass.1976) (stating "[a]ll representatives of news organizations must not only be given equal access, but within reasonable limits, access with equal convenience to official news sources"); *Lewis v. Baxley,* 368 F.Supp. 768, 777 (M.D.Ala. 1973) (finding the right of "newsmen" to reasonable access to news of government extends "to access to places where other members of the press may go and congregate in the ordinary course of events. In other words, there is a limited First Amendment right of access to the public galleries, the press rooms, and the press conferences dealing with state government.").

Moreover, the Defendants' argument that Plaintiffs' exclusion has not denied them access to information available to the general media is not persuasive. Pursuant to the Defendants' policy, members of the media may call "any individual into the press room who is not a member of the working media as long as the purpose is for a quick interview or a brief clarification of a newsworthy issue." [3] Complaint Exhibit A. Thus, to the extent that entry into the "general-circulation media" press room provides media representatives with additional access to information, Plaintiffs' First Amendment rights are being violated. *See Consumers Union,* 365 F.Supp. at 25–26; *ABC, Inc.,* 570 F.2d at 1083; *Westinghouse Broad. Co. Inc.,* 409 F.Supp. at 896–97; *Lewis,* 368 F.Supp. at 776–78. While Defendants proffer the argument that the "particular-profession media" room provides Plaintiffs with the same access to information, Plaintiffs are nevertheless deprived of the same news gathering environment and opportunities afforded to the "general-circulation media." *See Consumers Union,* 365 F.Supp. at 25–26; *ABC, Inc.,* 570 F.2d at 1083; *Westinghouse Broad. Co., Inc.,* 409 F.Supp. at 896–97; *Lewis,* 368 F.Supp. at 776–78.

 Defendants also contend that they need only show that the Press Room Procedures meet the rational basis test because no First Amendment right is implicated. As explained above, Plaintiffs' First Amendment rights are implicated.

78 (M.D.Ala.1973). *See also Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), *overruled by Brown v. Board of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

**3.** As a result of Plaintiffs' exclusion from the "general-circulation media" room, *UTD Today* and Katz may be deprived of the opportunity to gather information when other reporters seek clarification of a newsworthy issue or a "quick interview" from any individual who is called into the "general-circulation media" room. Moreover, these individuals may make themselves available to the "general-circulation" press room to the exclusion and detriment of those media representatives confined to the "particular-profession" media room. Thus, Defendants' policy has in effect tainted Plaintiffs as second class media.

*See supra* pp. 1372–73. Consequently, "where First Amendment rights are involved courts balance the importance of the activity and the degree and type of restraint against the governmental interest in having the particular restraining law that infringes or tends to infringe upon First Amendment rights." *Lewis,* 368 F.Supp. at 778–779. "This balancing test is two pronged: first, whether the asserted state interest is 'compelling' (or 'paramount'), and second, whether the state's action has the requisite nexus with the state's asserted goal." *See id. See also Gibson v. Florida Legislative Investigation Comm.,* 372 U.S. 539, 546, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963).

Thus, Defendants must demonstrate a "compelling" interest to support their policy of classifying Plaintiffs as "particular-profession media" and excluding them on this basis. *See Branzburg v. Hayes,* 408 U.S. 665, 700, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *DeGregory v. Attorney General,* 383 U.S. 825, 829, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966); *Consumers Union,* 365 F.Supp. at 25; *Borreca v. Fasi,* 369 F.Supp. 906, 908–909 (D.Haw.1974) (stating "[w]here First Amendment rights are involved, the asserted state interest must be compelling and the proposed state action must be the least restrictive means available for the asserted governmental end"). As explained above, Defendants are relying on the content of Plaintiffs' publication to classify them as a "particular-profession media" organization. *See supra* pp. 1372–73. Thus, having found Defendants will have to satisfy the high standard of proffering a "compelling" governmental interest in support of their policy, the Court finds that there is a substantial likelihood that Plaintiffs will succeed on the merits of their First Amendment claim. *See Consumers Union,* 365 F.Supp. at 25–26; *Lewis,* 368 F.Supp. at 779; *Borreca,* 369 F.Supp. at 910.

Second, Defendants will have to show that their policy has the requisite nexus with the School Board's asserted goal. *Gibson,* 372 U.S. at 546, 83 S.Ct. 889; *NAACP v. Alabama,* 357 U.S. 449, 464, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Lewis,* 368 F.Supp. at 778–779. According to Villafaña's Affidavit and testimony, the Press Room Procedures were enacted to serve the legitimate interest of controlling disruption and space constraint issues and providing reporters a press room unfettered from any undue influence. Villafaña Affidavit ¶¶ 5–6. At this stage of the proceedings, it does not appear that excluding "particular-profession" media personnel, including representatives from *UTD Today* and Katz, from the "general-circulation media" press room is the least restrictive means available to achieve the ends asserted by the School Board. *See Borreca,* 369 F.Supp. at 908–909. In this regard, Defendants will have to demonstrate that only by excluding "particular-profession" media will they achieve their desired goals. *See id.* At this time, it appears to the Court that Defendants' decision to rely on the scope of a publication's circulation to determine access to the media room is an arbitrary means to address disruption and space constraint issues and provide reporters a press room unfettered from any undue influence. *See Sherrill,* 569 F.2d at 129 (stating "arbitrary or content-based criteria for press pass issuance are prohibited under the First Amendment") (citing *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)). Considering the evidence presented to the Court at this stage of the proceedings in light of the fact that the School Board ultimately must show a "substantial" nexus between the chosen means and a compelling governmental interest, the undersigned finds Plaintiffs have demonstrated a substantial likelihood of suc-

cess on the merits of their First Amendment claim.

■ As for irreparable injury, the second prong of the test for a preliminary injunction, the threat that Katz will be excluded from the press room is real and imminent. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). On the third prong, the injury UTD and Katz will suffer easily outweighs any potential injury a preliminary injunction might cause the School Board. Katz has covered meetings from the press room for 20 years. It would do no harm to the School Board for Katz to be allowed to use the press room during the pendency of these proceedings. *See Borreca,* 369 F.Supp. at 911.

■ Finally, it appears that the public interest would not be harmed by an injunction that allows Katz and representatives of *UTD Today* to use the press room. To the contrary, based on the cited authorities, it appears that the public interest will be well served by such relief. *Id.*

However, as the undersigned stated at the hearing, by granting Plaintiffs' motion for a preliminary injunction, the Court is not ruling that Defendants have to allow non-media representatives access to its press room. Likewise, the Court is not finding that the School Board may not regulate access to its press room; it just may not do so based on the content of the publication.

■ Therefore, the motion for a preliminary injunction is granted, effective immediately. No bond will be required inasmuch as no conceivable economic harm can result from the injunction. Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendant Stierheim, in his official capacity as Superintendent of Miami–Dade County Public Schools, is hereby enjoined from preventing, or advising any person to prevent, or enforcing a policy of preventing, the plaintiff Katz, or any other accredited *UTD Today* reporter, from using the School Board's press room or other press facilities on the same basis and to the same extent as other members of the news media.