# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 23, 2020

Decided June 5, 2020

No. 19-5255

BRIAN J. KAREM,
APPELLEE

v.

DONALD J. TRUMP, IN HIS INDIVIDUAL CAPACITY AND OFFICIAL
CAPACITY AS PRESIDENT OF THE UNITED STATES AND
STEPHANIE A. GRISHAM, IN HER INDIVIDUAL CAPACITY AND
OFFICIAL CAPACITY AS WHITE HOUSE PRESS SECRETARY,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02514)

*James M. Burnham*, Attorney, U.S. Department of Justice, argued the cause for appellants. On the briefs were *Ethan P. Davis* and *Hashim M. Mooppan,* Deputy Assistant Attorneys General, and *Scott McIntosh*, *Daniel Tenny*, *Joshua M. Salzman*, and *Ashley Cheung*, Attorneys.

*Theodore J. Boutrous Jr.* argued the cause for appellee. With him on the brief were *Anne Champion*, *Lee R. Crain*, and *Thomas H. Dupree Jr.*

*Bruce D. Brown*, *Katie Townsend*, and *Gabriel Rottman* were on the brief for *amici curiae* Reporters Committee for Freedom of the Press, et al. in support of appellee seeking affirmance.

*George A. Lehner* was on the brief for *amicus curiae* The White House Correspondents' Association in support of appellee seeking affirmance.

Before: SRINIVASAN, *Chief Judge*, and TATEL and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: For over fifty years, the White House Press Secretary has provided journalists on the White House beat with "hard passes"—special press credentials that allow on-demand access to the White House complex. Until last year, the Press Secretary had never revoked or even briefly suspended a hard pass based on a journalist's unprofessional conduct at a White House press event. But following an incident at President Trump's 2019 Social Media Summit involving Appellee Brian Karem, a hard-pass holder, and Sebastian Gorka, a Summit attendee, the Press Secretary suspended Karem's pass for thirty days on the ground that his conduct violated "professional journalistic norms." Karem filed this suit to enjoin enforcement of the suspension, arguing that it violated the First and Fifth Amendments. The district court found Karem's Fifth Amendment due process claim likely to succeed on the merits and preliminarily enjoined the suspension. With one minor adjustment to the injunction's scope, we now affirm. Karem is likely to succeed on his due process claim because, on this record, he lacked fair notice that the White House might punish his purportedly unprofessional conduct by suspending his hard pass for a month.

3

**I.**

Our court addressed the constitutional protections associated with hard passes in *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977). That case concerned journalist Richard Sherrill's application for a hard pass. At the time, "no written procedures" and "no published . . . regulations" "pertaining to the issuance of press passes for the White House" existed. *Id.* at 126–27. Instead, the White House Press Office typically approved a journalist's hard-pass application if "the applicant ha[d] obtained a pass for the House and Senate press galleries, reside[d] in the Washington, D.C. area, . . . need[ed] to report from the White House on a regular basis," and passed a "Secret Service . . . security check." *Id.* at 126. Although Sherill satisfied the first three requirements, the Secret Service denied his application for "reasons of security." *Id.* at 127. Sherrill filed suit, arguing that the denial violated his First and Fifth Amendment rights.

We began by emphasizing that Sherrill's claim "[wa]s not premised upon the assertion that the White House must open its doors to the press, conduct press conferences, or operate press facilities." *Id.* at 129. But given that "the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom" and given that "[t]hese press facilities are perceived as being open to all bona fide Washington-based journalists," we held that "the protection afforded newsgathering under the first amendment . . . requires that this access not be denied arbitrarily or for less than compelling reasons." *Id.* at 129 (internal citations omitted). Moreover, "the interest of a bona fide Washington correspondent in obtaining a White House press pass" is not only "protected by the first amendment" but also "undoubtedly qualifies as [a] liberty [interest] which may

not be denied without due process of law under the fifth amendment." *Id*. at 130–131.

With that established, we found the denial of Sherrill's application suspect for several reasons. First, nothing "inform[ed] the public or other potential applicants of the basis for exclusion of journalists from the White House press facilities" because the "standard for denial of a press pass ha[d] never been formally articulated or published." *Id*. at 130. Next, "the phrase 'reasons of security' [wa]s unnecessarily vague and subject to ambiguous interpretation." *Id*. And finally, the Secret Service failed to provide Sherrill "notice . . . of the factual bases for [his] denial" and "an opportunity to rebut." *Id*. at 131. Concluding that the denial "violate[d] the first and fifth amendments," we ordered the Secret Service "to articulate and publish an explicit and meaningful standard governing denial of White House press passes for security reasons[] and to afford procedural protections to those denied passes." *Id*.

Forty years on, today's hard-pass system is little changed from the one described in *Sherrill*. The White House continues to issue hard passes that "allow[] access to the White House complex on short notice, and with minimal delay" to "[j]ournalists who cover the White House regularly." Gillman Decl. ¶¶ 6, 9, Joint Appendix (J.A.) 78–79. To obtain such passes, journalists must already hold a congressional press pass, regularly cover the White House, and reside in the D.C. area. Applicants must also clear a Secret Service background check—now conducted, in light of *Sherill*, pursuant to formally promulgated regulations. *See* 31 C.F.R. § 409.1.

Although the hard-pass system has existed in similar form for decades, the record before us indicates that, at least prior to 2018, the White House took a seemingly *laissez-faire* approach to journalists' behavior on the White House grounds. As former

White House Deputy Chief of Staff for Communications Bill Shine explained to hard-pass holder Jim Acosta in a 2018 letter, which we shall have more to say about momentarily, the White House had never promulgated formal, written guidance regulating hard-pass holders' conduct at press conferences and events. *See* Letter from Bill Shine, Deputy Chief of Staff for Communications, to Jim Acosta 1 (Nov. 19, 2018), J.A. 693 ("Acosta Letter"). Instead, the White House relied "on a set of understood professional norms." *Id.* And according to Sam Donaldson, a hard-pass holder who covered the White House for over fifty years, "never did any President or their staff threaten to revoke or suspend" his or any other journalist's hard pass "because of . . . alleged misconduct during a press conference or other press event until President Trump took office." Donaldson Decl. ¶ 5, J.A. 62; *see also* Gillman Decl. ¶ 8, J.A. 79 (declaring that, as a former board member of the White House Correspondents' Association, he knew of no pre-2018 instance in which a press secretary ever "denied, revoked[,] or suspended" a hard pass because of a journalist's purported misconduct). This was so despite reported incidents, described in the record and unchallenged by the White House, in which journalists "rudely interrupted" presidents, "berated White House press secretar[ies]," Joseph Curl, *The White House Press Corps Is Broken Beyond Repair*, Wash. Times 1 (June 19, 2018), J.A. 719, and "engaged in . . . shoving match[es] over positions in the briefing room," Steven V. Roberts, *Washington Talk: The Presidency; Shouting Questions at Reagan*, N.Y. Times 5 (Oct. 21, 1987), J.A. 717.

That hands-off approach ended in 2018 following an incident involving Acosta at a presidential press conference. After asking several questions that elicited no response from President Trump, Acosta refused to immediately yield the microphone. Declaring the conduct inappropriate and unprofessional, the Press Secretary—at the time, Sarah

Sanders—revoked Acosta's hard pass that same day. Acosta filed suit to enjoin enforcement of the suspension, arguing that the White House failed to provide fair notice that unprofessional conduct could result in the revocation of a hard pass. The district court preliminarily enjoined the suspension, finding Acosta likely to succeed on the merits of his due process claim. *See* Hearing Tr. 9–10, *Cable News Network, Inc. v. Trump*, No. 18-2610 (D.D.C. Nov. 16, 2018).

Instead of appealing, the White House issued Acosta the aforementioned letter, which purported "to convert into rules . . . widely understood practices" and norms governing "White House press conferences." Acosta Letter 1, J.A. 693. The Acosta Letter enumerated several "rules governing future press conferences" and made clear that "[f]ailure to abide by any of [these] rules . . . may result in suspension or revocation of the journalist's hard pass." *Id*. Central to the issue before us, the Acosta Letter also stated that "a more elaborate set of rules might be devised, including . . . specific provisions for journalist conduct in the open (non-press room) areas of the White House" but expressly declined "to frame such rules in the hope that professional journalistic norms will suffice to regulate conduct in those places." *Id*. The letter recognized, however, that that the White House may "be forced to reconsider this decision" "[i]f unprofessional behavior occurs in those settings, or if a court should decide that explicit rules are required to regulate conduct even there." *Id*. The White House circulated the substance of the Acosta Letter to the press corps in November 2018.

This litigation arises out of an incident that occurred in those "open (non-press room) areas of the White House." *Id*. Neither side meaningfully disputes the district court's account of the incident, captured in multiple videos and summarized below. *See Karem v. Trump*, 404 F. Supp. 3d 203 (D.D.C.

2019); *see also* Appellee's Br. 32 (accepting the district court's account); Appellants' Reply Br. 15 ("[T]he facts are largely undisputed as they were captured in multiple videos.").

In July 2019, President Trump hosted a Social Media Summit attended by various internet influencers and personalities, including former presidential advisor Sebastian Gorka. At the Summit's conclusion, the President delivered prepared remarks in the Rose Garden, which the White House press corps, Appellee Brian Karem included, covered. Like other reporters, Karem listened to the remarks from a roped-off press area that surrounded the rows of chairs where Summit attendees, including Gorka, sat.

After concluding his remarks, President Trump walked back towards the White House, at which point Karem shouted a question at the President, who ignored it and went inside. Several Summit attendees, however, reacted to Karem's question: one shouted, "He talked to us, the real news," and another said sarcastically, "Don't be sad, don't be sad." *Karem*, 404 F. Supp. 3d at 206. Karem smiled, gestured to the attendees, and declared, "This is a group eager for demonic possession." *Id*. Although several people laughed, Gorka "took it differently." *Id*. He "turned around in his chair and yelled, 'And you're a 'journalist,' right?'—making air quotes with his hands." *Id*. As Gorka began to stand, Karem shouted in response, "Hey come on over here and talk to me, brother, or we can go outside and have a long conversation," while motioning backward with his right thumb over his shoulder. *Id*. Gorka then walked briskly toward Karem, shouting, "Are you threatening me now in the White House? In the Rose Garden? You are threatening me in the Rose Garden?" *Id*. With the two men now standing face to face, Karem, his voice lowered, stated, "I said I'd be happy to talk to you." *Id*. Gorka, still yelling, responded, "You are a punk! You're not a journalist!

You're a punk!" *Id.* Gorka then walked away, and, as he did, Karem twice shouted in his direction, "Go home," and then, "Hey Gorka, get a job!" *Id.*

Several minutes after this initial incident, Karem again encountered Gorka, this time in the White House Palm Room. Placing his hand on Gorka's arm, Karem "tried to explain that, in making his earlier comment, he had only meant that he wanted to talk." *Id.* at 207. "Gorka . . . disagreed," prompting Karem to repeat, "I said 'talk.'" *Id.* As staffers began ushering press out of the Palm Room, Gorka repeatedly told Karem, "You're done." *Id.* Before walking away, Karem tried to shake Gorka's hand, but Gorka refused.

Three weeks later, then-Press Secretary Stephanie Grisham notified Karem by letter that because of his conduct at the Summit, she had made a preliminary decision to suspend his hard pass for thirty days. Grisham acknowledged that although "[t]he White House has issued written rules of conduct governing questions at press conferences," it "had not previously thought that a set of explicit rules was necessary to govern behavior by members of the press at White House press events." Letter from Stephanie A. Grisham, White House Press Secretary, to Brian Karem 1 (Aug. 2, 2019), J.A. 109 ("First Karem Letter"). She attributed the lack of such "explicit rules" to the "widely shared understanding" that "(1) members of the press, at all times at White House press events, must act professionally, maintain decorum and order, and obey instructions from White House staff, and (2) disruptive behavior that interferes with the conduct of a press event or is otherwise a breach of professional decorum—including but not limited to taunting other members of the press, White House officials, or guests in an effort to provoke a confrontation—is prohibited." *Id.* Grisham concluded that Karem's "disruptive behavior at the press event in the Rose Garden . . . violated the

basic standards governing such events and is, in our preliminary judgment, sufficient factual basis to suspend your hard pass for 30 days." *Id.* at 2, J.A. 110.

Karem responded to Grisham's letter through counsel. He disputed her account of events, asked her to reconsider the decision, and argued that, in light of *Sherrill*, the suspension would be unconstitutional.

After meeting with Karem's counsel to discuss the matter, Grisham notified Karem by letter of her "final determination to suspend [his] hard pass for 30 days." Letter from Stephanie A. Grisham, White House Press Secretary, to Theodore J. Boutrous Jr. 1 (Aug. 16, 2019), J.A. 139 ("Second Karem Letter"). She explained that Karem's "demonic possession" comment "was inappropriate and unprofessional" because "it denigrated the mental state of the gathered audience," even if, as Karem claimed, it was meant as "nothing more than a good-natured exchange." *Id.* at 5–6, J.A. 143–44. Grisham also determined that, whatever Karem's "subjective intent," his "go outside" remark and "gestures . . . created the impression to a reasonable observer that [he] was suggesting a physical confrontation." *Id.* at 4, 7, J.A. 142, 145. Finally, Grisham found that Karem aggressively confronted Gorka in the Palm Room and "ignored . . . repeated directions to leave." *Id.* at 5, J.A. 143.

According to Grisham, Karem's "unacceptable and disruptive" conduct "require[d] a response to ensure that it does not happen again." *Id.* at 8, J.A. 146. She considered "a range of potential responses," including issuing Karem a written warning and revoking his hard pass permanently. *Id.* She rejected the former as "insufficient given the serious nature of Mr. Karem's misconduct and the ineffectiveness that a written warning would have in deterring similar misconduct by Mr.

Karem or others in the future" and the latter as "too great a punishment for the conduct involved here." *Id.* at 8–9, J.A. 146–47. Ultimately, Grisham settled on "a temporary suspension" because "[i]t properly accounts for Mr. Karem's stated need for his press pass and it imposes no greater a restriction than is necessary for an effective sanction." *Id.* at 8, J.A. 146. The suspension took effect immediately.

Within days of receiving the final decision, Karem filed this suit against President Trump and Grisham (collectively, "the White House"), seeking to enjoin the suspension, both preliminarily and permanently, on the grounds that it violated the First and Fifth Amendments. The district court, applying the traditional four-part test for preliminary relief, *see Winter v. National Resource Defense Council, Inc.*, 555 U.S. 7, 20 (2008), and relying on *Sherrill*, found Karem's due process claim likely to succeed on the merits. Specifically, on the preliminary record before it, the district court concluded that Karem lacked fair notice that his unprofessional conduct could be punished by the thirty-day suspension of a hard pass because no formal, written standards regulated reporters' conduct at non-press-conference events. The court rejected the White House's contention that the Acosta Letter provided such notice, explaining that "the letter's language . . . is ambiguous as to whether the White House even intended to regulate events other than formal press conferences." *Karem*, 404 F. Supp. 3d at 213. Moreover, "even if" the Acosta Letter's "professional journalistic norms" standard put reporters on notice that "certain conduct outside of press conferences could be punishable through revocation of a hard pass," the district court determined that "Karem's behavior was [not] clearly proscribed by the Acosta Letter's standard, or even by any widely understood standard of 'professionalism' or 'decorum' within the context of such an unruly event." *Id.* at 213, 216. As to Karem's "demonic possession" comment and his lingering

in the Palm Room as "White House staff[] . . . tr[ied] to usher all press out of the room," the court found such behavior at least arguably within the compass of the "freewheeling . . . and aggressive conduct [by White House reporters that] has long been tolerated without punishment." *Id.* at 207, 214. And as to Karem's invitation to Gorka to "go outside and have a long conversation," the court found that "the videos make clear that it [too] was meant as an irreverent, caustic joke." *Id.* at 215. The district court concluded that these "brief" interactions, coming "after the President's remarks had concluded" and as the event was breaking up, were not "clearly sanctionable in the context of the White House press corps." *Id.* (emphasis omitted).

Having found Karem likely to succeed on the merits of his due process challenge, the district court declined to address the remaining claims. It then preliminarily enjoined the suspension because Karem stood to suffer irreparable First Amendment harm and because the balance of equities and public interest weighed in favor of an injunction. *Id.* at 216–18.

By the time the district court's injunction went into effect, Karem had already served eighteen days of his thirty-day suspension. As a practical matter, then, the dispute now before us concerns only whether the suspension may be reinstated for twelve additional days (after an interim period in which Karem has resumed covering the White House). We address Karem's likelihood of success on the merits in Part II and the remaining preliminary injunction factors in Part III.

## II.

Karem raises a host of challenges to the suspension of his hard pass, including that he lacked fair notice of the proscribed conduct; that the professionalism standard permitted discriminatory enforcement; that the White House failed to

hand over key evidence; that Grisham predetermined the proceeding's outcome; that the suspension constituted veiled content- and viewpoint-based punishment; and, lastly, that "nothing provided [him] with notice of the severity of the penalty that might be imposed" for his purportedly unprofessional conduct. Appellee's Br. 35 (internal quotation marks omitted). We begin—and end—with Karem's final argument.

"A fundamental principle in our legal system," the Supreme Court observed in *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Id*. at 253. Such "[e]lementary notions of fairness," the Court explained in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the government] may impose." *Id*. at 574. "This requirement of clarity[,] . . . essential to the protections provided by the Due Process Clause of the Fifth Amendment," *Fox Television*, 567 U.S. at 253, "is implicated" whenever the government imposes "civil penalties," *Gore*, 517 U.S. at 574 n.22 (emphasis omitted). Where such penalties "threaten[] to inhibit the exercise of constitutionally protected rights[,] . . . a more stringent vagueness [and fair-notice] test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982).

That "essential . . . protection[]" of fair notice applies here. *Fox Television*, 567 U.S. at 253. As we explained in *Sherrill*, "the interest of a bona fide Washington correspondent in obtaining a White House press pass . . . undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." 569

F.2d at 130–131. And because "any deprivation" of a protected liberty interest must "be effected pursuant to constitutionally adequate procedures," *Brandon v. District of Columbia Board of Parole*, 823 F.2d 644, 648 (D.C. Cir. 1987), a duly issued hard pass may not be suspended without due process. Accordingly, "[e]lementary notions of fairness" required that Karem "receive fair notice not only of the conduct that [would] subject him to punishment, but also of the . . . magnitude of the sanction that [the White House] might impose." *Gore*, 517 U.S. at 574. Furthermore, because the suspension of a hard pass, like the denial of a hard pass, "implicate[s]" "important first amendment rights," *Sherrill*, 569 F.2d at 130, we evaluate Karem's suspension under a particularly "stringent vagueness [and fair-notice] test," *Village of Hoffman Estates*, 455 U.S. at 498–99.

Applying that test, we think Karem's due process claim is likely to succeed because, on this record, nothing put him on notice of "the magnitude of the sanction"—a month-long loss of his White House access, an eon in today's news business—that the White House "might impose" for his purportedly unprofessional conduct at the non-press-conference event. *Gore*, 517 U.S. at 574. True, the Acosta Letter set forth "rules governing future *press conferences*," but in that very same letter, the White House expressly declined to adopt "specific provisions for journalist conduct in the open (non-press room) areas of the White House" "in the hope that professional journalistic norms" would "suffice to regulate conduct in those places." Acosta Letter 1, J.A. 693 (emphasis added). What's more, although the White House made clear that "failure to abide by" the newly articulated *press-conference* rules "may result in suspension or revocation of the journalist's hard pass," it declined to adopt analogous sanctions for unprofessional conduct at *non-press-conference events*. *Id*. Instead, the White House stated that "[i]f unprofessional behavior occur[red] in

those settings," then it would "reconsider this decision"—that is, the lack of formally articulated standards and sanctions—not that it would suspend journalists' hard passes. *Id.*

Even assuming the Acosta Letter provided Karem some notice of behavioral expectations "in the open . . . areas of the White House," *id.*, it failed to put him on notice of "the magnitude of the sanction that [the White House] might impose" for his purported failure to heed any such expectations, *Gore*, 517 U.S. at 574. To the extent Karem's "irreverent, caustic" attempts at humor (to use the district court's language) crossed some line in the White House's view, those transgressions were at least arguably similar to previous journalistic misbehavior that elicited no punishment at all, let alone a month's exile. *Karem*, 404 F. Supp. 3d at 215. In the context of a White House press corps described as an "unruly mob," *id.* at 214 (internal quotation marks omitted), Karem's behavior was not so outrageous as to bring into fair contemplation the unprecedented sanction visited on him.

The White House's arguments to the contrary are without merit.

First, the White House insists that *Gore* is distinguishable because the "punitive sanction" at issue there—millions of dollars in punitive damages—"[wa]s tantamount to a severe criminal penalty," 517 U.S. at 585, whereas the suspension of a hard pass does not rise to that level, *see* Oral Arg. Rec. 14:18–48. But the Supreme Court made clear in *Gore* that the "basic protection against judgments without notice afforded by the Due Process Clause . . . is implicated" when the government imposes "civil penalties." 517 U.S. at 574 n.22 (internal quotation marks, citation, and emphasis omitted). And in *Fox Television*, the Court held that administrative "findings of wrongdoing" that "could have an adverse impact on [a

regulated entity's] reputation" counted as "sanctions" that triggered the "essential . . . protection[]" of "fair notice." 567 U.S. at 253, 256. If the mere threat of "reputational injury," *id*. at 254, qualifies as a "civil penalt[y]," *Gore*, 517 U.S. at 574 n.22, then surely so does the suspension of Karem's hard pass—a "punishment" aimed at "sanction[ing]" and "deterring" his conduct, Second Karem Letter 8–9, J.A. 146–47. Indeed, a thirty-day forced hiatus inflicts considerably more than a reputational injury on a journalist, for whom sustained access is essential currency.

Next, the White House contends that "basic standards of professionalism" should have put Karem on notice that "breaches of [such] standards . . . can carry consequences stricter than an admonition not to engage in that behavior again." Appellants' Br. 28. In *Sherill*, however, we explained that, at least in the context of hard passes, due process requires that "explicit and meaningful standard[s]" "be[] formally articulated or published." 569 F.2d at 130–31. Accordingly, the White House may not rely on unarticulated standards of professionalism or "the adage that some things go without saying" to justify the thirty-day suspension for the conduct at issue here. Appellants' Br. 4.

The White House also argues that it satisfied the dictates of due process by notifying Karem of the possible sanction in Grisham's initial letter. True enough, that letter informed Karem that the White House planned to suspend his hard pass for a month. Critically, however, it did so only after the offending conduct occurred. Although courts routinely "clarify[] the law and apply[] that clarification to past behavior," *Qwest Services Corp. v. FCC*, 509 F.3d 531, 540 (D.C. Cir. 2007), "the principle of fair warning" requires that novel standards announced in adjudications "must not be given retroactive effect . . . where [they are] unexpected and

indefensible by reference to the law which had been expressed *prior to the conduct in issue*," *Rogers v. Tennessee*, 532 U.S. 451, 462 (2001) (internal quotation marks omitted and emphasis added). That principle applies not only in criminal cases, but also in the civil context. In *Fox Television*, for example, the Supreme Court held that the FCC violated due process by penalizing broadcasters pursuant to novel standards announced in adjudications because the broadcasters "lacked notice at the time of their broadcasts that the material they were broadcasting could be found actionabl[e] . . . under then-existing policies." 567 U.S. at 258.

Here, the "law . . . expressed prior to [Karem's] conduct" failed to put him on notice that he could lose his hard pass for a month. *Rogers*, 532 U.S. at 462. As explained above, the White House "had not previously thought that a set of explicit rules was necessary to govern behavior by members of the press at White House press events." First Karem Letter 1, J.A. 109. Nor had it ever "revo[ked] or suspen[ded] . . . a hard pass" for ostensibly unprofessional conduct outside press conferences, despite evidence that "White House press events [we]re often freewheeling" affairs, where "aggressive conduct ha[d] long been tolerated without punishment." *Karem*, 404 F. Supp. 3d. at 214–15 (citing Gillman Decl. ¶ 8, J.A. 79). Thus, like the broadcasters in *Fox Television*, Karem "lacked notice at the time" that his conduct could occasion a thirty-day hard-pass suspension "under then-existing policies." 567 U.S. at 258. Far from "clarifying the law and applying that clarification to past behavior," *Qwest*, 509 F.3d at 540, then, the suspension effectuated an "unpredictable break[] with prior" policy and practice, *Rogers*, 532 U.S. at 462.

Finally, raising the specter of the absurd, the White House argues that it cannot be the case that "the Press Secretary would be powerless to take action even were a reporter to 'moon' the

President, shout racial epithets at a foreign dignitary, or sexually harass another member of the press corps." Appellants' Reply Br. 4. But just as "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others," *Hoffman Estates*, 455 U.S. at 495, the White House cannot defend the thirty-day suspension here on the ground that some other, egregious conduct might justify the same sanction. And even if the White House could impose that sanction for such egregious conduct consistent with due process, Karem's behavior as reflected in the preliminary injunction record fell below that threshold. Notions of professionalism are, after all, context-dependent. *Cf. Strickland v. Washington*, 466 U.S. 668, 693 (1984) ("[A]n act or omission that is unprofessional in one case may be sound or even brilliant in another."). "[W]ithin the context of such an unruly event" as the Summit, "where jocular insults had been flying from all directions," *Karem*, 404 F. Supp. 3d at 215–16, Karem's statements were not so egregious as to justify suspending his hard pass for thirty days without prior notice.

In any event, the White House can rest assured that principles of due process do not limit its authority to maintain order and decorum at White House events by, for example, ordering the immediate removal of rogue, mooning journalists. We hold only that to "punish[]" Karem, Second Karem Letter 8, J.A. 146, the White House was required to provide fair notice of "the magnitude of the sanction that . . . might [be] impose[d]," *Gore*, 517 U.S. at 574. As the Acosta Letter recognizes, the White House may promulgate such sanctions any time it wishes, but, until then, due process precludes the White House from "punish[ing]" Karem as it did here. Second Karem Letter 8, J.A. 146.

18

### III.

The remaining preliminary injunction factors also counsel in favor of affirmance.

Karem stands to suffer immediate irreparable harm absent an injunction. As our court has explained, "a prospective violation of a constitutional right constitutes irreparable injury for . . . purposes" of "seeking equitable relief." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). The White House nonetheless insists that no injunction should issue because Karem stands to suffer only a procedural harm. Once again, *Sherrill* forecloses the White House's argument. There, we held that the precise harm complained of here—a violation of Fifth Amendment due process rights—supported injunctive relief. *See* 569 F.2d at 131 (ordering the Secret Service to afford applicants "notice, opportunity to be heard and a final written statement of the bases of denial" and to "publish an explicit and meaningful standards governing denial of White House press passes").

As for the balance of equities and public interest, factors which "merge when," as here, "the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), the White House surely has a legitimate interest in maintaining a degree of control over media access to the White House complex. "The Constitution," however, "does not permit [it] to prioritize any policy goal over the Due Process Clause," and "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653.

### IV.

We end with a note about the injunction's scope. The district court ordered "the Defendants" to restore Karem's hard

pass, meaning the injunction runs to both the Press Secretary and President Trump. Order Granting Pls.' Mot. for Prelim. Inj., J.A. 806. The White House argues that "[t]he President is not a proper defendant in this case and . . . no temporary injunctive relief can issue against him." Appellants' Br. 22 n.4. Karem does not contest this point. We therefore affirm the preliminary injunction but limit its scope to run only to the Press Secretary.

*So ordered.*