# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 26-5113

September Term, 2025

1:25-cv-04218-PLF

**Filed On:** April 27, 2026

New York Times Company and Julian E.
Barnes,

       Appellees

    v.

United States Department of Defense, also
known as Department of War, et al.,

       Appellants

**BEFORE:** Walker, Childs[*], and Garcia, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for stay pending appeal, the opposition thereto, and the reply; and the motion to participate as amicus curiae and the lodged amicus brief, it is

**ORDERED** that the motion to participate as amicus be granted. The Clerk is directed to file the lodged amicus brief. It is

**FURTHER ORDERED** that the emergency motion for stay be granted and that the district court's April 9, 2026, order be stayed to the extent that it entitles journalists to access the Pentagon unescorted.

I

Last fall, the Pentagon announced a new policy governing Pentagon Facility Alternate Credentials (PFACs), the passes journalists have historically used to access the Pentagon. The new policy restricted this access and implemented rules that would allow

---

[*] Circuit Judge Childs would deny the emergency motion for stay for the reasons stated in the attached dissenting statement.

the Pentagon to revoke credentials if the holder was determined to be a "security or safety risk to Department personnel or property." 2025 PFAC Policy 10, Dkt. No. 29 at 12. A reporter could be deemed a "security or safety risk" "based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure" of Department information. *Id.*

The New York Times (NYT) and one of its journalists, Julian E. Barnes, filed suit to enjoin several provisions of the policy as unconstitutional under the First and Fifth Amendments, and as arbitrary and capricious under the APA. Compl. ¶¶ 60–134, Dkt. No. 1. On cross-motions for summary judgment, the district court held that the rules governing when a PFAC may be denied for "security" reasons were unconstitutionally vague in violation of the Fifth Amendment because they "fail[ed] to provide fair notice of what routine, lawful journalistic practices" would trigger credential revocation. *New York Times Co. v. Dep't of Def.* (*NYT*), 2026 WL 788689, at *11 (D.D.C. Mar. 20, 2026). Turning to the First Amendment, the court noted there was no dispute that "[t]he regular presence of PFAC holders at the Pentagon . . . enhanced the ability of journalists and news organizations . . . to keep Americans informed about the United States military." *Id.* at *3 (citing Statement of Undisputed Material Facts (SUMF) ¶ 11, Dkt. No. 10-36); *see also* Response to SUMF ¶ 11, Dkt. No. 22-2. Moreover, this arrangement had "pos[ed] no security or safety risk to Department property or personnel." SUMF ¶ 11. By contrast, the district court concluded that the record was "replete with undisputed evidence that the Policy" was specifically, and unreasonably, designed to deprive "disfavored" journalists of access to a nonpublic forum. *Id.* at *13–14. Accordingly, the district court granted summary judgment to the plaintiffs on their constitutional claims, without addressing the APA claim. *Id.* at *8.

The next business day, the government replaced the invalidated policy with a new one that revised provisions the district court had declared unconstitutional and announced new "physical security restrictions" for all PFAC holders. Interim PFAC Policy 2–3, Dkt. No. 37-2. Those restrictions required that PFAC holders be escorted in all areas of the Pentagon "at all times" and limited their opportunities for entry to five approved purposes. *Id.* at 3. At the same time, the Department announced that the previously available workspace in the "Correspondents' Corridor" was closed and that a new workspace "will be established in an annex facility." *Id.*

The plaintiffs promptly moved to compel compliance with the summary judgment order, and the district court granted that motion. *NYT*, 2026 WL 962252, at *10 (D.D.C.

Apr. 9, 2026).  In addition to declaring the "adoption and enforcement" of "the escort requirements and access limitations" in violation of its previous order, the district court ordered the Department to reinstate "access" to the Pentagon "commensurate with the access provided to PFAC holders on March 20, 2026, following this Court's Order vacating certain provisions of the prior PFAC Policy." *Id.* at *10–11.  The Department responded by asking the district court for a stay pending appeal "to the extent" the district court's order "vacate[d] and enjoin[ed] the Pentagon's new physical access restrictions—the escort requirement and the physical access limitations."  Mot. to Stay 1, Dkt. No. 58.  The district court denied that motion but granted a fourteen-day administrative stay to allow the Department to seek relief here.  Order on Mot. to Stay, Dkt. No. 59.

The Department appealed and filed an emergency motion for a stay pending appeal.  The Department seeks very limited relief.  In particular, it seeks "a stay only to the extent that the latest order entitles reporters to access the Pentagon unescorted." Emergency Mot. to Stay 3; *see also* Wilson Decl. ¶ 3, Dkt. No. 58-1 (stating that the Department is seeking "a stay of the requirement that the Department provide unescorted access to the Pentagon for holders of [PFACs]").  Unlike its stay motion below, the motion before us does not address any other provision of the Department's Interim PFAC Policy. It does not ask that we stay the district court's order prohibiting enforcement of the Interim Policy's provisions that restrict Pentagon access for PFAC holders to particular purposes. *See NYT*, 2026 WL 962252, at *10.  Nor does it ask us to revive any particular language from the "Escort Privileges and Procedures" section of that policy or the "New Media Physical Security Restrictions" that section incorporates by reference.  *See* Interim PFAC Policy 2–5.  Rather, the Department's briefs focus solely on being permitted to require escorts to accompany PFAC holders on Pentagon premises, while otherwise leaving unchallenged at this stage enforcement of the district court's order in all other respects. Moreover, the Department represented to the district court that "there is no requirement" under the Interim Policy "to make advance requests for an escort" and there would be "no concern that the Department could deny" a PFAC holder an escort.  Tr. of Hr'g on Mot. to Compel 31, Dkt. No. 50.  We understand those representations to carry forward here and assess the Department's arguments accordingly.

II

In deciding whether to grant a stay pending appeal, we must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of

the stay will substantially injure other parties interested in the proceedings; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). We conclude the Department has shown that it meets the requirements for this limited stay pending appeal.

On the questions of irreparable harm, the balance of equities, and the public interest, both parties identify weighty competing interests. The Pentagon Press Secretary has submitted a declaration explaining that prior to the 2025 PFAC Policy, journalists obtained "sensitive or classified" information "often monthly, and sometimes multiple times per month," including information concerning "operational plans" and "intelligence assessments." Wilson Decl. ¶ 4. Unescorted access to the Pentagon was, according to the Department, "a significant contributing factor" to that pattern because it enabled reporters to "observe activity patterns" and identify potential sources of sensitive information. *Id.* ¶ 7. On that basis, the Department argues that unescorted access to the Pentagon will increase the risk that journalists obtain and disseminate sensitive information, jeopardizing national security. *See* Emergency Mot. to Stay 19–20; Wilson Decl. ¶¶ 12–16. The Department has thus supported its claim that this aspect of its policy furthers important national security interests. *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 307 (1981). For their part, plaintiffs contend that the policy burdens newsgathering by restricting access in ways that impair their ability to "ask questions, confirm information," and "receive timely updates"—opportunities that once lost, "will be lost forever." Opp'n to Emergency Mot. to Stay 18. That burden extends beyond the press itself, implicating the public's interest in the free flow of information about government operations. *See Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977).

Because both sides have established substantial, competing interests, the balance of the equities and the public interest do not strongly favor either party. Our decision therefore turns on the merits. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024).

The Department has shown that it is likely to succeed on the merits of the issue it presents. Under settled law, an agency may respond to an adverse ruling by adopting a revised policy, and it "need not seek modification of [an] injunction before it initiates" those efforts. *NAACP v. Donovan*, 737 F.2d 67, 72 (D.C. Cir. 1984). That principle is implicated here. The escort requirement was not contemplated by the challenged 2025 policy. So the district court's March 20 summary judgment opinion and order did not address that provision or a similar one. Moreover, in part because the challenge to the Interim PFAC Policy was presented in a motion to compel compliance, the district court did not hold that the escort requirement independently violates the First or Fifth Amendment. *See NYT*,

**No. 26-5113**                                    **September Term, 2025**


2026 WL 962252, at *4.  On this record, the Department is likely to succeed in its argument that the escort requirement in particular is a new, generally applicable requirement that is not invalid for violating the district court's summary judgment order or the constitutional principles underlying it.

For these reasons, the emergency motion for a stay pending appeal is granted.

**Per Curiam**


                              **FOR THE COURT:**
                              Clifton B. Cislak, Clerk

                    BY:     /s/
                              Daniel J. Reidy
                              Deputy Clerk

CHILDS, *Circuit Judge*, dissenting: An injunction is not an invitation to circumvention. Once a court has spoken, the party bound by its order may not evade it through creative policymaking. On March 20, the district court ordered the Department of Defense to restore certain New York Times reporters' Pentagon press credentials. The Department responded by restoring the credentials but stripping away much of what made them matter: regular, unescorted access to the Pentagon and the press workspace inside it. The district court determined that such conduct was noncompliant with its injunction. My colleagues stay that ruling. Because the Department has not made a strong showing that the district court erred in interpreting its own injunction, I respectfully dissent.

## I.

The district court's order on March 20 supplies the relevant background. *See New York Times Co. v. DOD* (*Merits Order*), No. CV 25-04218, 2026 WL 788689, at *2–7 (D.D.C. Mar. 20, 2026). Before that order, Pentagon Facility Alternate Credentials (PFACs) gave certain journalists regular access to the Pentagon. The Department of Defense's 2025 PFAC Policy restricted that access and allowed the Department to revoke credentials when a journalist was deemed a "security or safety risk to Department personnel or property." 2025 PFAC Policy, Dkt. No. 29 at 12. That designation could rest on "unauthorized access, attempted unauthorized access, or unauthorized disclosure" of Department information. *Id.*

The New York Times and one of its reporters challenged several provisions of that policy. The Plaintiffs moved for summary judgment and the district court granted it. It held that the challenged provisions violated the First and Fifth Amendments. *See Merits Order*, 2026 WL 788689, at *8–17. It then ordered the Department to "immediately reinstate the PFACs" of seven New York Times reporters. *Id.* at *20.

What happened next drives this appeal. On the next business day, the Department issued the Interim PFAC Policy. That policy did more than revise the provisions the district court had invalidated. It imposed a new access regime. PFAC holders could enter the Pentagon only for limited purposes, and only with an escort "at all times." Interim PFAC Policy, Dkt. No. 37-2, at 3. The Department also closed the Correspondents' Corridor, the workspace PFAC holders had long used inside the Pentagon and moved press workspace to an annex facility.

The district court concluded that those charges were noncompliant with its Merits Order. *See New York Times Co. v. DOD* (*Enforcement Order*), No. CV 25-04218, 2026 WL 962252 (D.D.C. Apr. 9, 2026). Granting the Plaintiffs' motion to compel compliance, it held that the Department's "adoption and enforcement" of "the escort requirements and access limitations" violated the Merits Order. *Id.* at \*10. The district court ordered the Department to restore Pentagon "access" "commensurate with the access provided to PFAC holders on March 20, 2026, following [its] Order vacating certain provisions of the prior PFAC Policy." *Id.* at \*11.

The Department appealed and filed an emergency motion for a stay pending appeal.

## II.

Considering that the majority already provides the stay factors above, *see* Majority Op. 3–4, I need not repeat them here. Nevertheless, a movant must satisfy the stringent requirements for a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). In deciding whether to grant a stay where there are "weighty [interests] on both sides," we assume special importance of the merits. *See Ohio v. EPA*, 603 U.S. 279, 291 (2024). Establishing a likelihood of success on the

merits is one of the "most critical" prongs of the test for a stay. *Nken*, 556 U.S. at 434. Moreover, we have also "emphasiz[ed] that our decision" in deciding a stay "cannot be divorced from the preliminary posture of th[e] appeal [and] the deferential standard of review of the district court's factfinding." *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *2 (D.C. Cir. Oct. 23, 2025) (per curiam).

## III.

The Department argues that the Interim PFAC Policy complied with the district court's Merits Order because, in its view, the policy is "lawful." Mot. to Stay 10. But the Department seeks a stay only of the district court's "latest order," Mot. to Stay 3, which is the Enforcement Order. So the relevant question is whether the district court correctly decided that the Interim PFAC Policy violated its Merits Order. It did. And because the district court was correct, the Department is unlikely to succeed on the merits.

## A.

I start with the district court's authority to interpret its own injunction. As a rule, a district court has both "jurisdiction" and "inherent power to enforce its judgments." *Peacock v. Thomas*, 516 U.S. 349, 356 (1996). That power reflects the judiciary's institutional interest "in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding." *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984). With that in mind, we review a "district court's interpretation and enforcement of its own orders" for abuse of discretion. *Nix v. Billington*, 448 F.3d 411, 414 (D.C. Cir. 2006) (citation omitted).

As Justice Scalia put it, "the construction given to the injunction by the issuing judge . . . is entitled to great weight." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 795 (1994) (Scalia, J., concurring in the judgment in part and dissenting in part) (collecting cases). Justice Breyer later described the same principle as "longstanding and well established." *Salazar v. Buono*, 559 U.S. 700, 762 (2010) (Breyer, J., dissenting) (citation omitted). On that understanding, "[t]he court granting the injunction is necessarily invested with large discretion in enforcing obedience to its mandate, and . . . courts of appellate powers are exceedingly averse to interfering with the exercise of such judgment and discretion." *Id.* (quoting 2 J. High, *Law of Injunctions* § 1458, pp. 1467–68 (4th ed. 1905) (collecting cases)).

That discretion is not exercised by parsing an injunction as though it were a tax code. Courts instead look "to the objects for which the injunctive relief was granted, as well as the circumstances attending it, in deciding whether an enjoined party has complied with an injunction." *Id.* (citation modified). Put simply, we must read an injunction in light of "what the decree was really designed to accomplish." *Mayor of Vicksburg v. Henson*, 231 U.S. 259, 273 (1913). To identify that purpose, we consider "the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the *mischief that the injunction seeks to prevent*." *Common Cause v. NRC*, 674 F.2d 921, 927 (D.C. Cir. 1982) (emphasis added) (citation modified). We do not "dissect the sentences of the United States Reports as though they were the United States Code." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Nor may a party exploit uncertainty as a license to disobey an injunction. If an injunction proves "too burdensome in operation," the party has "a method of relief apart from an

appeal." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949). It may petition the district court "for a modification, clarification or construction of the order." *Id.* (citing *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15 (1945)). After all, an appellate court is not the proper forum of first instance for resolving the particulars of an injunction. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) (explaining that if a party believes an "injunction was improper" she should "challenge[] it" in the court of first instance (citation omitted)). When parties choose "to make their own determination of what the [injunction] meant," they "act[] at their peril." *McComb*, 336 U.S. at 192.

These principles decide the point here. The Department was not free to make its own practical construction of the Merits Order, adopt a substitute policy that preserved the very "mischief that the injunction seeks to prevent[,]" *Common Cause*, 674 F.2d at 927, and then insist that compliance was complete because the new policy was labeled "interim." The district court was entitled—indeed required—to measure the Interim PFAC Policy against the Merits Order's purpose, the record that produced it, and the access it was designed to protect. Viewed through that lens, the district court correctly decided that the Department had not complied.

**B.**

In light of those principles, the district court's Merits Order was clear that the Department had to "immediately reinstate the PFACs" of seven New York Times reporters. *Merits Order*, 2026 WL 788689, at *20. The Department did not do that. Instead, as the district court found, it "cut off all PFAC holders' meaningful access to the Pentagon." *Enforcement Order*, 2026 WL 962252, at *4. That finding matters because the point of the injunction, as the district court

interpreted it, "was to restore The Times journalists' access to the Pentagon, not merely to ensure that they have possession of a physical credential." *Id.* (citation omitted). The Interim PFAC Policy thus runs headlong into what the injunction "was really designed to accomplish." *Henson*, 231 U.S. at 273.

The district court's factual findings confirm the point. As even the majority notes, *see* Majority Op. 2, the Department announced—on the next business day after the injunction issued—that it was closing the Correspondents' Corridor. The district court also found that the Department relegated PFAC holders "to work from a space outside the Pentagon building." *Enforcement Order*, 2026 WL 962252, at *7 (citing several declarations). And it found more still: the Department announced that journalists could no longer enter the Pentagon "at all without a Department escort," and that even escorted access would be limited to particular events. *Id.* (citation omitted). The Interim PFAC Policy says just that. PFAC holders may "continue to have access to the Pentagon for scheduled press briefings, press conferences, and interviews arranged through public affairs offices." Interim PFAC Policy, Dkt. No. 37-2, at 3. Even then, they must be escorted by authorized Department personnel "at all times." *Id.*

That is not the access the Merits Order restored. In explaining why "the remedies available at law [were] inadequate," the district court expressly relied on the proposition that "the only way to remedy the injury [from the loss of a press credential] is to return the hard pass and the access that comes with it." *Merits Order*, 2026 WL 788689, at *17 (quoting *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019), *aff'd as modified*, 960 F.3d 656 (D.C. Cir. 2020)). As for the facts it relied upon, the district court explained that the parties did not dispute that the "[t]he regular presence of PFAC holders at the Pentagon has enhanced the

ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk." *Id.* at *3 (citing Statement of Undisputed Material Facts (SUMF) at 3 (¶ 11)). The district court also found that it was undisputed that from the Pentagon "reporters historically have been able to cover official press briefings, including those called on short notice (or without notice), and to ask questions of Pentagon officials at (and before and after) those briefings." *Id.* (citing SUMF at 3 (¶ 12)). The district court found next that those reporters "also have engaged in additional semi-formal and informal conversations with senior Department officials and their aides, as well as public affairs staff." *Id.* (citing SUMF at 3 (¶ 13)). "These in-person interactions," as the district court determined and the parties did not dispute, "can be crucial to obtaining the context and detail needed to report accurately and effectively about defense policy and military operations." *Id.* (citing SUMF at 3 (¶ 13)).

That makes sense. Reporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders. *See Enforcement Order*, 2026 WL 962252, at *8 ("These restrictions make it exceedingly difficult to cover the Department and the U.S. military from the Pentagon grounds."). Given the district court's factual findings and the law it applied, the purpose of the injunction was clear: The Department had to give PFAC holders unescorted access. That was the *status quo* through decades and wars—including after the "terrorist attack on September 11, 2001," Pentagon Press Ass'n Amicus Br. 7.

The Department, in support of its position, cites *NAACP, Jefferson County Branch v. Donovan* 737 F.2d 67, 72 (D.C. Cir. 1984), to argue that "an agency need not seek modification of [an] injunction before it initiates those efforts." Mot. to Stay

16 (quoting the same).[1] But the Department reads *Donovan* for more than it says. To be sure, this court explained there that "[i]t is both logical and precedented that an agency can engage in new rulemaking to correct a prior rule which a court has found defective." 737 F.2d at 72 (citations omitted). And where "an injunction is based on an interpretation of a prior regulation, the agency need not seek modification of that injunction before it initiates new rulemaking to change the regulation." *Id.* So *Donovan* permits an agency to begin new rulemaking without first asking the district court to modify an injunction. Sure enough. But that case does not permit an agency to implement a new policy whose practical effect is to nullify an injunction.

Indeed, *Donovan* distinguished precisely that situation, noting the order before it was not an "emergency" rule whose "only effect" was to "avoid compliance" with a "prior court order." *Id.* (contrasting *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920 (D.C. Cir. 1984)). Yet that is exactly what the district court found to have occurred here. *See Enforcement Order*, 2026 WL 962252, at *8 ("In light of all this, the Court has no choice but to conclude that the Department's abrupt closure of the Correspondents' Corridor and its ban on credentialed journalists traveling unescorted through the Pentagon are not security measures or efforts to make good on prior commitments but rather transparent attempts to negate the impact of this Court's Order."). Because the district court's determination of the Department's motive "is a question of fact," *Elastic Stop Nut Div. of Harvard Indus., Inc. v. NLRB*, 921 F.2d 1275, 1280 (D.C. Cir. 1990), and because no party contends that determination was clearly

---

[1] The majority takes the same tack. *See* Majority Op. 4 (quoting *NAACP, Jefferson Cnty. Branch v. Donovan*, 737 F.2d 67, 72 (D.C. Cir. 1984)).

erroneous, I defer to it at this emergency posture. *See Media Matters for Am.*, 2025 WL 2988966, at \*2.

Given the foregoing reasons, the Department has not made a "strong showing that [it] is likely to succeed on the merits." *Nken*, 556 U.S. at 434. The Department bears the burden of justifying "such an extraordinary remedy," *Cuomo v. NRC*, 772 F.2d 972, 978 (D.C. Cir. 1985), and its stay application fails on the first stay factor. Since the Department has not shown that the Interim PFAC Policy likely complied with the Merits Order, I would deny the stay without reaching the remaining factors. *See Citizens for Responsibility & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam) ("show[ing] little prospect of success" on appeal is "an arguably fatal flaw for a stay application.").

\* \* \* \*

Considering that my colleagues grant the Department's stay application, I respectfully dissent.